Nott, J.,
delivered the opinion of the court:
This is an action brought, upon a former decree of this court, to recover $723 32, a balance remaining unpaid and unsatisfied.
Tire former decree was rendered on the 13th April, 1888, wherein, among other things, it was adjudged that the captured property of the claimants “was sold in the manner pro- *176 videcl by lato, and the proceeds of the said sale, after deducting all lawful expenses attending the disposition of the same, were paid over into the Treasury of the United States, where the same noto remain, amounting to the •sum of $9,904 44.”. A report from the late Secretary of the Treasury to this court, made in the present case, shows that the former decree was not wholly satisfied, and affords only this explanation of the deduction made at the Treasury:
11 That, after a thorough and faithful examination into the accounts and statements of the agents of this department who were engaged in the collection, transportation, and sale of the said fifty-two (52) bales of cotton, it toas ascertained that the sum of nine thousand one hundred and eighty-one dollars and twelve cents ($9,181 12) was the residue of the proceeds of the sale of the fifty-two (52) bales of cotton aforesaid, after deducting ‘ the expense of transportation and sale of said property, and the other lawful expenses attending the disposition thereof and' no more ; therefore, the said sum of $9,181 12 teas paid in satisfaction of the judgment of the court for $9,904 44.”
As the amount of the net irroceeds in the Treasury had been one of the issues joined in the former suit, and as the court passed upon it, finding and adjudging, on the evidence, the precise amount due to the claimants, it is apparent that the Secretary did not aquiesce in the finality of the judgment, but, on the contrary, sought to revise it, and himself decide what were the u lawful expenses attending the disposition” of the captured property.
This attempt of an executive officer to constitute himself a supreme judicial tribunal which might annul the judgments of a court confessedly clothed with jurisdiction of the subject-matter, must be deemed extraordinary, though there were at the time some circumstances which palliate, if they do not justify the action of the late Secretary.
Subsequently, the irrecise position assumed by the Secretary of the Treasury was brought before the Supreme Court by the appeal in the case of Nelson Anderson, (9 Wall. R., p. 58,) and presented in the following proposition: “ That the Court of Claims had- no authority to render judgment for a specific sum, the power of the court being limited to the point of deciding whether the claimant was entitled to recover at all, leaving the amount to be determined by computation by the *177 proper officers of the Treasury Department.” Tbe Supreme Court made very short work with the proposition, and disposed of it in a single sentence. u To sustain this position,” says Mr. Justice Davis, who delivered the opinion of the court, 11 would require its to hold that for this class of cases Congress intended to constitute the Court of Claims a mere commission. The court will not attribute to Congress a purpose that would lead to such a result, in the absence of an express declaration to that effect.”
The position of the late Secretary, therefore, was utterly untenable, and his action in depriving a citizen of property which had been lawfully adjudged to be his by a tribunal having’ jurisdiction both of the parties and the action, was a dangerous exercise of official power which the law will neither authorize nor leave unredressed.
It is objected on the part of the defendants that this court has no jurisdiction of this action; that the judgments in these causes are payable out of the “ abandoned or captured property fund,” and out of that only 5 and that the whole power of this court in regard to that fund is exhausted when it has mice passed upon the question of the claimants’ rights. On the part of the claimants, it is replied that this action is not brought under the Abandoned or captured property act, but under the statute creating the court, and conferring upon it jurisdiction of all claims founded upon any contract, express or implied, (Act 2ith February, 1855,10 Stat. L., p. 612 5) and that the action of debt, when brought upon a judgment, is am action founded upon a contract, (3 Elks., p. ICO.)' The broad question has also been argued whether in this court a claimant may procure a judgment against the government, and then bring his action upon it, giving it in evidence as conclusive, incontestable proof of the defendant’s indebtedness, and recovering upon it, as he might against an ordinary defendant in courts of the common law.
The answer does not meet the objections nor reach the real merits of the case. The claimants’ former suit was not an action at law, brought to recover damages, but a suit in equity, prosecuted by the beneficiary of a trust against his trustee for the execution of the trust, and seeking to recover merely the party’s own property, consisting .of the specific proceeds of a specific thing. That such is the nature of a suit under the’ Abandoned or captured property aet was in effect held by this *178 court iu Woodruff’s Case, (4 C. Cls. B., p. 480,) and Bernheimer’s, (5 id., p. 549,) but the Supreme Court has given to the statute that express construction. “ Congress,” says Mr. Justice Davis, in Nelson Anderson’s Case, (suprá,) “ constituted the government a trustee for so much of this property as belonged to the faithful southern people ; and while directing'that all of it should he sold and its proceeds paid into the Treasury, gave to this class of persons an opportunity, at any time withm tivo years after the suppression of the rebellion, to bring their suit in the Court of Claimsr and establish their right to the proceeds of that portion of it which they oioned.” Again, the Supreme Court has said yet more clearly: “ The government is a trustee, holding the proceeds of the petitioner’s property for his benefit; and having been fully reimbursed for all expenses incurred in that character, loses nothing by the judgment, lohich simply awards to the petitioner what is his own.” (Padelford’s Case, 9 Wall. B., p. 543.)
Out of this trust fund it was undoubtedly the defendants’ right to have the judgment discharged. Moreover, the government is not liable for the mistake, neglect, or misfeasance of its officer's. Why, then, should the defendants be called upon to pay the portion withheld by the late Secretary out of their own funds — out of moneys raised by taxation and appropriated to the payment of debts contracted by the nation ¶
If the inquiry were to stop at this shallow depth, and if it were the duty of a court to deny a plaintiff justice on any pretext that its ingenuity may dress in plausible guise, we might very speedily be rid'of this case. But, as was repeated by Lord Mansfield, in Rees v. Abbot, (Cowp. R., p. 832,) “ Judges should be astute in furtherance of right, and the means of recovering it.” Here it is most certainly right that the claimants should be paid the money which the proper tribunal, after a full hearing, has solemnly adjudged to be theirs — a judgment in effect affirmed by the highest tribunal of our judicial polity; and whatever astuteness the judges of this court may possess should be given to seeking “the means of recovering it.”
Of “the means of recovering it” under the former judgment, I observe—
First, that the party could have no execution. An execution at law is a writ issuing out of a court, directed to an officer thereof, and running against the body or goods of a party. In equity cases the decree often takes the place of a writ, but it *179 contains the same ingredients; it is directed to an officer of the court5 it commands; it runs against the property or person of a party to the suit. In these cases there is nothing that bears the likeness of a writ of execution or contains any of its ingredients; the court issues no command; nothing runs against the property of the defendants; the Secretary of the Treasury is not an officer of the court. The Abandoned or captured property act merely provides that the claimant shall “receive” the residue of the proceeds after the deduction of certain expenses; or, in other words, establishes a rule for the measure of damages; the act reconstituting this court, that its “'final judgments” “ shall be paid out of any general appropriation made by law for the payment and satisfaction of private claims, on presentation to the Secretary of the Treasury of a copy of said judgment.” (Act 3d March, 1803,12 Stat. L., p. 7G0, § 7.)
Observe, now, that the language of the statute is explicit and exclusive. A copy of the “ judgment” cannot be construed to mean a writ of execution; “ on presentation ” to the Secretary by the claimant, will not bear the interpretation of being issued to the Secretary by the court. Moreover, when a writ of execu- ■ cution issues, a 'party may have an alias and a pluries if the first be returned unsatisfied; or he may rule the sheriff to return it; or sue him for not satisfying it out of the defendant’s goods; and the court never loses' its control over the writ, nor its authority over the officer.
Secondly. It is thought by some of the court that the claimants have their personal action against the late Secretary. In cases where a public officer has been guilty of aggressive acts, without authority of law, against the person of an individual, as in Mostyn v. Fabrigas, (Cowp. R., p. 150,) or against the rights of private property, as in Harmony v. Mitchell, (13 How. R., p. 115,) courts have regarded him as going beyond the bounds of his office, and not being shielded by the colore officii he might throw around his tortious act. But here there was notrespáss upon the claimants’ property nor assault against their person. An officer acting on the behalf of the government, which for the time being he represented, simply refused to relinquish the property which he held, or pay over the money of which he was the custodian. There was no actual malice, no constructive trespass; the act was strictly negative-refusing to obey and execute the law.
*180 Iu our owu country tliere has grown up such a belief in the divine right of public officers so nearly resembling all that was ever believed of the divine right of kings, that it is vain to look for more than one personal action brought against a high officer of State. (Stokes v. Kendall, 14 Peters.) In England the highest have never been deemed higher than the law; and to the English courts we may turn with profit to learn to what extent great public functionaries are amenable in courts of justice at the suit of injured citizens.
There is the old case in Cowper, where the governor of Minorca illegally imprisoned and banished a citizen. It was in 1771 — a hundred years ago; but an English jury soon after cast him in £3,000 damages, and the Court of King’s Bench, with Mansfield at its head, sustained the verdict. Mostyn v. Fabrigas, (Cowp. R., p. 150.) So the divine right of governors was disposed of, even as against a poor Minorcan, only by treaty made a subject of Great Britain.
There is a later case against another governor — the Governor of Gibraltar, 1841. (Glynn v. Houston, 2 Manning & Granger’s Com. Pls. R., p. 337.) He sent a company of soldiers to search for a Spanish general secreted in a certain house. An English merchant, in an adjoining house, coming to his own door, was stopped by a sentry’s bayonet, and compelled to remain within till the search was over. The merchant brought his action. For this constructive assault .of the Governor, by the sentry, and this imaginary invasion of an Englishman’s castle by compelling the owner to remain within it for a few moments, an English jury fined the Governor £50. On a motion for a new trial all the judges of the Common Pleas held that the action would lie, and that the verdict should stand. Wherefore the divine right of governors to do unlawful acts may be considered now, as in Great Britain, entirely at an end.
There is the case of Buron v. Denman, (2 Exch. R., p. 167,) a leading case upon- another point of law, where a captain in the royal navy was sued, the damages being laid at £100,000, for destroying the slave barracoons of a foreigner on the coast of Africa. All of the barons of the Exchequer held the act was unlawful and the officer liable, but justified by the subsequent ratification of his government. Lord Wensleydale, then Mr. Baron Parke, doubted whether the maxim, omnis ratihabitio retrotrahitur et mandato equiparatur, should apply; that is, *181 whether ratification by the government itself could make that lawful subsequently which was unlawful at the time the thing, was clone. But the distinctive principle of this case — much misunderstood at home and abroad — has been pointed out by the Queen’s Bench in an opinion from which I shall presently quote.
• To go back, there is a case in Chancery, before Lord Eldon, in 1816, the case of Walker v. Congreve, (1 Carpmael Patent Cases, p. 356,) where an officer of the government of some distinction, Sir William Congreve, acting Under orders from the ordnance office, saw fit to violate an injunction restraining- him from manufacturing a patented article. The lord chancellor said with great frankness and with «great firmness, 0 There has been an ex parte injunction granted in this case, and 1 think I ought not to have granted it before hearing the other side. Had I read the bill and affidavit with strict attention, I think I should not have granted the injunction. I would wish to speak with all respect that I ought of Sir William Congreve in his official and individual character, but I must tell him what I would tell any other man who is brought as a suitor into this court, that he must not disobey its orders. He might have moved to dissolve the injunction, but he could claim no right.to infringe it.” “ Speaking with all respect, I will'treat government here as I would any suitor of the court. Let an account be kept of all machines made in alleged violation of the plaintiff’s patent, subject to the profits to which the plaintiff will -be entitled if the patent has been infringed. I thus secure to Mr. Walker all that he can wish, or all that he is entitled to obtain. In the mean time let the injunction be dissolved, and let the defendant proceed in supplying the demands of the public service, ■ subject only to account at the instance of the plaintiff on the trial of the legal issue. I would recommend to government to pay the costs of the present application, as there are grounds for believing the injunction violated. I can only recommend the government, but I would have it understood that, if the recommendation is not attended to, I will malte an order for the defendant, Sir William Congreve, to pay them?
There was a case before the privy council in 1860, an -appeal from the supreme court of Calcutta, in an action brought against a public officer for a wrongful act officially done. In an opinion prepared by Sir John Taylor Coleridge and read by
*182 Dr. Lushington, an opinion much quoted and approved by the other English courts, it -is said: “If the act which he (the defendant) did was in itself wrongful as against the plaintiffs, and produced damage to theni, they must have the same remedy by action against the doer, whether the act was his own, spontaneous .and unauthorized,- or whether it was done by the order of the superior power. The civil irresponsibility of the supreme power for tortious acts could not be maintained with any show of justice if its agents were not personally responsible for them ; in such cases the government is morally bound to indemnify its agent, and it is hard on such agent when this obligation is not satisfied ; but the right to compensation in the party injured is paramount to this consideration.” Rogers v. Dutt, (13 Moore’s P. C. R., p. 236.)
There was, in 1842, a notable case before tiie House of Lords, Farguson v. Earl of Kinnoul, (9 Clarke & Fin. R., p. 251,) where a personal action had been brought against the members of a presbytery of the established church of Scotland. The case comes pretty close to the present one, if it be not identical with it in this, that the rights of the party, had been the subject of judicial decision, (p. 278.) It was held with unanimity that u if the lato easts any duty upon a person which he refuses or fails to perform, he is answerable in damages to those whom his refusal or failure injures,” and that “ persons having judicial functions, bv,t being also required to perform ministerial acts, may be sued for damages occasioned by their neglect or refusal to perform such ministerial acts.”
The decision is illumined with the concurring opinions of Lyndhurst, and Brougham, and Oottenham, and Campbell. Our own Supreme Court has considered the case, and construed it to decide this: “ That the refusal to obey the lawful decree of a court of justice was a wrong, for which the party who had sustained injury by it might maintain an action and recover damages against the wrong-doer.” Kendall v. Stokes, (3 How. R., p. 98.)
But these, it may be said, were not actions against high officers of state. However, in 1862, an action was brought “ against the secretary of state for the home department, for not submitting to her Majesty a petition of right presented by the plaintiff under1 Boville's Petition of Right act,1 whereby he was prevented from having the same prosecuted.” Irwin v. Gray, (3 Fost. & Finlason’s N. P. R., p. 635.) And the plaintiff actually called the secretary, Sir George Gray, as a witness, who came into *183 court autl testified uthat he liad submitted the petition to her Majesty, and that he had not advised her'to.grant her fiat.” Upon, this all the judges of tbe Common Pleas thought “the case was ■at an end $” uitioas enough that the secretary of state had submitted the petition toiler Majesty“ it was clearly the duty of the secretary of state to examine the petition of right, and to give his advice upon it ivhether a cause of action against the Groton arose f’ but none of them seems to have doubted that if the secretary of state had neglected his duty and done nothing he would have been amenable at law for his negligence.
More remarkable is the case in the Queen’s Bench, in 1863, •of Lieutenant Colonel Dickson v. The Secretary for War, the lord lieutenant commanding a military district, and his own colonel, (id., p. 527,) ufor causing, by means of false charges, the removal of the plaintiff from the office of lieutenant colonel of ■the regimentP • All of these officers were called as witnesses. In the course of the trial, and while the secretary for war was in the witness-box, Lord Chief Justice Cockburn put this question to him :
“ Was there any personal influence used, or sought'to be used, upon you, to make you depart from the ordinary course ? ” And it appearing that there had been none, the lord chief j ustice thus put the case: “ I shall tell the jury that if they believe that his intention was to oppress and injure the plaintiff, he is liable; but that if he made the recommendation to dismiss him out of an honest sense of duty, even though he may have been mistaken, he is not liable in law?
But the highest declaration of this principle came from the ■same judge in 1865, when delivering the opinion of the Queen’s Bench in Feather v. The Queen, (6 Best & Smith’s Q. B. R., p. 257.) “Let it not, however, be supposed,” he says, “that a •subject sustaining a legal wrong at the hands of a minister of the Crown is without a remedy. As the sovereign cannot authorize wrong to' be done, the authority of the Crown would afford mo defence to an action brought for an illegal act committed by an officer of the Crown. The learned counsel for the suppliant rested part of his argument on the ground that there could be no remedy by action against an officer of state for an injury done by the authority of the Crown, but he altogether failed to make good that position. The case of Buron v. Denman, (2 Exch. R., p. 167,) which he cited in support of it, *184 only shows that where an act injurious to a foreigner, and which might otherwise afford a ground of action, is done by a British subject, and the act is adopted by the government of this country, it becomes the act of the State, and the private right of action becomes merged in the international question which arises between our government and that of the foreigner. The decision leaves the question as to the right of action between subject and subject wholly untouched. On the other hand, the case of the general warrants, Money v. Leach, (1 T. R., p. 493,) and the cases of Sutton v. Johnson, (3 Burr., p. 1742,) and Sutherland v. Murry, (1 T. R., p. 598,) there cited, are direct authorities that an action will lie for a tortious act, notwithstanding it may have had the sanction of the highest authority in the state. But, in our opinion, no authority is needed to establish that a servant of the Grown is responsible in law for a tortious act done to a felloiv-subjeet, though done by the authority of- the Grown — a position which appears to us to rest upon principles which are too' well settled to admit of question, and which are alihe essential to uphold the dignity of the Grown on the one hand and the rights and liberties of the subject on the other.”
Therefore it appears, by the concurrent opinions of all the judges of the six great courts of Great Britain — the Exchequer, the Common Pleas, the Queen’s Bench, Chancery, the Privy Council, and the House of Lords — that it is a fundamental principle that every British subject who has suffered a legal wrong shall have legal redress against some one; a lofty ground to be maintained, but the only ground to stand upon if vested rights are to be secure or laws are to prevail over men.
But it is proper to note here that while the English courts have held the highest officer of the state to the strictest accountability at law in cases where the act complained of was tortious or unlawful, they have not sustained an action where the officer, being invested with a discretion, did, within the proper jurisdiction of the office, erroneously exercise it. The case where such an action has been most seriously considered is that of Gidley v. Lord Palmerston, (2 Brod. & Bing., p. 275.)
There the secretary of war had received a fund, to be paid and distributed to certain persons. In the exercise of his official discretion, he had refused to x>a.y to the x>laintiff. The plaintiff brought his action, and it was held by Lord Chief Jus *185 tice Dallas, after a review of the English cases, u that on principles of public policy an action will not lie against -persons acting in a public character and situation which, from their very nature, would expose them to an infinite multiplicity of actions — that is, to actions at the instance of any person who might suppose himself aggrieved. And though it is to be presumed,w he adds, “that actions improperly brought would fail, and it may be said that actions properly brought should succeed, yet the very liability to an unlimited multiplicity of suits would, in all probability, prevent any proper or prudent person from accepting a public situation at the hazard of such peril to himself.”
There is however a distinction taken by English lawyers between ordinary claims upon the treasury and ths judgments of their courts. “ Where money,” says Manning, in his Exeheq. Prac., p. 85, uis recovered against the Grown, the torit of execu,tion for the subject is directed to the treasurer and chamberlain, who appear to be personally responsible to the plaintiff if they do not appropriate the first moneys that come to their hands toward satisfying Ms demand.” I cannot, however, find, on the one hand, that the point has been actually decided.; nor, on the other, that any officer of the English government has ever undertaken to revise the decisions of their courts of law, nor destroy the solemnly-adjudged rights of a subject of Great Britain.
But though our individual opinions may. be that an action at law will lie against the Secretary of the Treasury, we cannot well decide the point in a collateral suit; nor does it follow that, as a remedy, it would be exclusive or adequate. As was said by the Supreme Court, where the head of another executive department had set himself the task of reducing the award of an arbitrator, uit is seldom that a private action at lato will afford an adequate remedy.” Kendall v. United States, (12 Peters’ R., p. 614.)
Thirdly. It remains to inquire whether a proceeding by mandamus would lie against the Secretary of the Treasury.
Such a power may be vested in the Court of Claims by the broad language of the act reconstituting it, to w generally exercise such powers as are necessary to carry out the powers herein -granted to it.” The power, undisputed, to decree the payment of money from the Treasury, may necessarily involve *186 the power11 to carry out” the decree: for wliere a statute imposes upon a public officer an official duty, aud provides no specific legal remedy for non-performance, there will be granted ex debito justitia a mandamus. Such a power we know, since the case of Marbury v. Madison, (1 Cranch R., p. 137,) is not a part of the original jurisdiction of the Supreme Court; and, since the case of McIntire v. Wood, (7 id., 504,) is not intrusted to the Circuit and District Courts of the United States; but nevertheless is vested, as has been held, in the courts of the District of Columbia.
There are two decisions of -the Supreme' Court relating to mandamus, indicative of- two classes of cases. In the first, Kendall v. The United States, (12 Peters’ R., p. 527,) it was held that the Postmaster General could be compelled, by mandamus, “ to credit the relators with the full amount of the award because this was ua precise, definite act, purely ministerial, and about which the Postmaster General had no discretion whatever.” In the second, Decatur v. Paulding, (14 Peters’ R., p. 497,) it was held that the Secretary of the Navy could not be compelled to pay a pension under an act of Congress, because the construction of the statute was an executive and not a mere ministerial act, and u where the laic authorized him to exercise discretion or judgment,” the court could.not revise his judgment, or interfere with his discretion. The first of these decisions has been neither repeated nor overruled, but it has been questioned on the same bench, (Mr. Justice Catron, 14 Peters’ R., p. 520;) the second has grown into a class of cases: Brashear v. Mason, (6 How. R., p. 92;) Reeside v. Walker, (11 id., p. 272;) United States v. Guthrie, (17 id., p. 284;) United States v. The Commissioner Land Office, (5 Wall R., p. 563;) Gaines v. Thompson, (7 id., p. 347;) The Secretary v. McGarrahan, (9 id., 298.)
Mandamus is a legal remedy for a legal right, granted where there is no specific legal remedy, and to prevent that defect of legal justice which would otherwise ensue. Existing anterior to the courts of equity, it partakes of the discretionary, flexible, and coercive remedies of equity jurisprudence, and is, I apprehend, termed u legal” chiefly because the single tribunal intrusted with the power in England is a court of law. Originating in the actual presence of the King in the early days of the Court of King’s Bench, and his desire to see justice done bjr his officers, it has been retained by that court, and applied upon *187 tlie theory of being the King’s own act. Hence the restrictive rule that it cannot be granted, against the Crown, or the ministers of the Crown, that the King cannot command himself. Yet it has been held to lie against the lords of the treasury, where they -were charged by statute with the payment of a pension, and a specific appropriation in-their hands was made for that purpose. Smyth’s Case, (5 Nev. & Man. K., p. 589; 6 id., p. 508.)
But this rule of the English law has occasioned doubts as to whether mandamus will lie against the Secretaries of our executive departments. First among our American cases is that of Marbury v. Madison, (1 Cranch, 137,) which determined that this power is not included in the original jurisdiction of the Supreme Court. But the well-known opinion of the Chief Justice examines the question of liability, and holds, 1st, that the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and do his conscience; and, 2d, that where the members of his cabinet 11 aid Mm in the performance of these duties,” actingdirectly or constructively in conformity with his orders, a their acts are Ms acts, and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion; ” but, 3d, “ when the legislature proceeds to impose on such an officer other duties, ichen he is directed peremptorily to perform certain nets, when the rights of individuals are dependent on the performance of those acts, he is, so far, the officer of the law ; is amenable to the laws for his conduct;” and 11 the individual who considers himself injured has a right to resort to the laws of his country for a remedy.” “ Is it to be contended,” exclaims the Chief Justice, “that where'the law in precise terms directs the performance of an act in which an individual is interested, the law is incapable of securing obedience to its mandates V’ The decision is higher in tone and bolder in terms than any that has come after it; nay, some of the cases which it puts illustratively have since been held to be beyond the aid of judicial power.
Thirty-five years later came the case .of Kendall v. Stokes, (12 Peters’ R., p. 524.) An act of Congress had authorized an arbitration, and directed the Postmaster General to credit the contractor with the amount of the award. The Postmaster *188 General refused, and the Circuit Court, in the District of Columbia, had the courage to issue against this high executive officer a peremptory mandamus. The act was sustained, on appeal, but by a divided court. The opinion was delivered by Mr. Jusice Thompson affirming the power, where the thing to be done is but ministerial, involving no exercise ©f discretion. With him were Story, McLean, Baldwin, Wayne, and McKinley. Dissenting were the Chief Justice, Barbour and Catron.
Only two years later came the case of Decatur v. Paulding, (14 Peters’ R., p. 497.) A Secretary of the Navy had refused to place on the pension list the widow of one of the most distinguished of our earlier naval officers,andthe court below7 had considered the case, and refused a mandamus on the merits. The Chief Justice and a maj ority of the judges held that the construe - tion of a statute by a Secretary was an executive act, involving the exercise of discretion, and that the Circuit Court was wbthout jurisdiction. Baldwin, J., took the distinction between jurisdiction and the proper exercise of jurisdiction. • Catron, J., held that the Circuit Court had not j urisdictioniu an y case, and he attacked the previous decision of Kendall v. Stokes. Into this case came the terms “executive” and “ministerial,” and while the great authority of Marbury v. Madison w&s not denied, and the express decision of Kendall v. Stokes wms not overruled, the boundaries, within which the wrrit might run were reduced to the narrowest possible limits.
It may be noted here that the Supreme Court has of late considered anew these terms “executive” and “ministerial,” and has defined “a ministerial duty, the performance of which may in proper cases be required of an executive department,” to be “ one in respeet to whieh nothing is left to discretion,” “ a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law State of Mississippi v. Johnson, (4 Wall. R., p. 498.) A definition which has subsequently been reiterated by the same court. Gaines v. Thompson, (7 id., p. 353.)
The next case was likewise against a Secretary of the Navy, and likewise involved on his part the construction of a statute. Brashear v. Mason, (6 How. R., p. 92.) Mr. Justice Nelson, who delivered the opinion of the court, distinguished it from Kendall’s Case, and rested it on Decatur's, and it may be noted that there was no dissent.
*189 In Reeside v. Walker, (11 How. R., p. 272,) tbe opinion of Mr. Justice Woodbury beld that, if mandamus will lie to compel tbe payment of money from tbe Treasury, it must be where tbe government is liable, and where an officer refuses to pay over money appropriated by Congress. In that case tbe court beld tbe gist of tbe petition failed; there was no judgment to be paid, no appropriation from which to pay it. And again there was no division in tbe court.
Then came tbe case of Goodrich v. Guthrie, (17 How. R., p. 284,) involving tbe construction of a statute and tbe constitutional power of tbe President to remove from office a territorial judge. Tbe reporter of tbe Supreme Court has framed tbe syllabus of a point decided, and has entitled tbe first opinion delivered “tbe opinion of tbe court;” but in fact no point was determined, and no opinion of tbe court delivered. Tbe opinion of Mr. Justice Daniel, so entitled, was based on one of tbe maxims of tbe King’s Bench, that there is no power in tbe court to command tbe withdrawal of money from tbe Treasury, and with him were tbe Chief Justice, Wayne, and Catron. Mr. Justice Curtis placed bis concurrence in tbe judgment expressly upon tbe ground that mandamus is not a legal remedy to try tbe title to an office, and with him were Nelson, Crier, and Campbell. Mr. Justice McLean dissented, and héld that tbe mandamus should issue.
Recently we have bad tbe case of Cox v. McGarrahan, (9 Wall. R., p. 298,) wherein tbe Kendall Case is spoken of as settling tbe jurisdiction of tbe former Circuit Court of tbe District, and wherein tbe present Supreme Court of tbe District is conceded to have succeeded to all its powers. Tbe case was reversed on several grounds, and determined nothing which bad not been determined repeatedly before.
In but two of these cases which have been carried by appeal to tbe Supreme Court, tbe first and last, (Kendall and Gox,) did a mandamus actually issue in tbe court below; in tbe first alone has tbe Supreme Court actually and positively affirmed tbe power of tbe court below to issue a mandamus against tbe bead of an executive department; in none has tbe power to command the withdrawal of money from tbe Treasury been ruled or conceded.
Therefore, it cannot be said to these claimants that even tbe extraordinary remedy of tbe “ high prerogative writ” of mandamus *190 is within their reach, though it be with us but a judicial remedy; Kentucky v. Ohio, (24 How. R., p. 66.) Never a writ of right, its issuance founded on a separate judicial proceeding little less than a distinct action, (Kendall v, Stokes, 3 How. R., p. 87,) and the power to issue it clouded in our own country with a judicial uncertainty that runs through the entire history of the national judiciary, beginning with 1 Crunch and continuing to 9 Wallace, it assuredly is not a remedy which a court can pronounce in a collateral suit to be certain, effectual, and within the control of the party needing its aid. We must close this inquiry with the conclusion that so far as the claimants’ former suit is concerned, these are left without certain remedy; that the judgment of a court of competent jurisdiction, in effect affirmed by the highest tribunal in the land, has been annulled by the arbitral^ and illegal act of a single executive officer; and that these citizens of the United States-, with the courts of the United States declaring their legal right on the one hand, and their prpperty actually in the Treasury of the United States on the other, will be left wholly without redress unless the present action may be maintained. “ The government of the United States,” said Chief Justice Marshall, uhas been emphatically termed a government of laios, and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested right.”
The remedy which these claimants have selected is an action at law for the moneys withheld. The action established the fact that the property of a citizen, which, in the language of the Supreme Court,'was “his own,” has been taken by the government’s chief financial officer. Under the Joint Resolution, 30th March, 1868, (15 Stat. L., p. 251,) this money, so taken, has been paid into the Treasury,of the United States, and is there retained by the defendants tfo their own use. Like all private property, it was covered by the guarantee of the Constitution that it should not “ be taken for public use without just compensation.” Like most property so taken, it came within the scope of the statutes creating and organizing the Court of Claims, and should be deemed to have been accepted by the defendants upon the terms and conditions of an implied contract.
As the question of jurisdiction has been raised — always the question of greatest importance — and as, unfortunately, the *191 court is divided upon it, I proceed to state the reasons which actuate the majority.
When the work of establishing the Court of Claims was before Congress, it appeared by the reports of their own committees that as long ago as in 1848, of 17,573 private claims which within ten years had been presented to Congress, 8,948 had never been in any way acted upon, and but 910 had passed both Houses. (Report by Hon. J. N. Rockwell, from Committee of Claims, House of Representatives, April 26,1848, first session Thirtieth Cong., vol. 3, No. 498.) That such a number of American citizens should have been left by their own government without a hearing, and to that extent at least without redress, was of itself a. great and grievous wrong. But while the great mass of creditors were left unheard, claims of doubtful character passed through Congress, some in forms which attracted attention, and others of which the country never heard, in the dubious disguise of ex parte arbitrations and awards.*
Moreover, the vast number of claims pressing upon Congress had surrounded the national legislature with influences importunate, if not corrupt, and the passage of some doubtful claims of large amount had aroused public suspicion, and lowered the character of Congress in the public mind. About the same time, too, a seal was set upon the degradation of one of the Houses by the expulsion of three members for receiving bribes for the prosecution through Congress of private claims. The proceedings will be found in the Congressional Globe for the third session of the Thirty-Fourth Congress, under the expressive title of 11 Corruption of Members of Congress.” Finally, the public credit had suffered, and the government, like all irresponsible purchasers, was compelled to pay more in the market for what *192 it bought than many of its own citizens, and the most prudent merchants and skilful manufacturers of the country refused to deal with it as a customer which held itself above all legal means of redress. To remedy these great mischiefs, the statesmanship of the day devised the Court of Claims. Coming before the Senate at first in the proposition to establish a board of commissioners for the investigation of claims, the bill was changed so as to establish a court for the avowed purpose of giving finality to its judgments. “ I want,” said a statesman of that day as distinguished as any, (Stephen A. Douglas) — “ I want cm adjudication which I should deem binding upon us? The act establishing the court was as remedial a statute as any that Congress ever passed — to repress a mischief and to advance a remedy.
In the great arrogance of great ignorance, our popular orators and writers have impressed upon the public mind the belief that in this republic of ours private rights receive unequalled protection from the government; and some have actually pointed to the establishment of this court as a sublime spectacle to be seen nowhere else on earth. The action of a former Congress, however, in requiring (Act July 27, 1868, 15 Stat. L., p. 243) that aliens should not maintain certain suits her'e unless their own governments accord a corresponding right to citizens of the United States, has revealed the fact that the legal redress given to a citizen of the United States against the United States is less than he can have against almost any government in Christendom. The laws of other nations havebeen produced and proved in this court, and the mortifying fact is judicially established that the government of the United States holds itself, of nearly all governments, the least amenable to the law.
First in this high civilization that protects the individual and assures his rights stands the great empire of the German states. “The state,” says alawyer, also distinguished as a writer, who was examined as a witness in this court, “represented in its pecuniary capacity as the representative of money and property affairs, is called the fiscus. For the purpose of maintaining suits against the government, the fiscus stands in the place of the government; for the purpose of compelling the payment of demands against the state, the fiscus is substituted for the state itself. I know of no restriction of the rights of the subjects of Prussia to maintain any suit against the fiscus; foreigners as *193 well as subjects, any man, can sue the fiscus ; the power to maintain a suit against tlie fiscus is a matter of absolute right. Suits in relation to state pi’operty, in which the fiscus is either plantiff or defendant., are treated and decided like suits among private parties, and all the consequences of defaults and executions take place against the fiscus. The fiscus is brought into court by the service of summons and complaint upon the fiscal attorney. The fiscal attorney has to answer just like any other party and bring his proof. Judgments rendered against the fiscus may he satisfied and discharged in the usual way, by execution? Brown's Case, (5 C. Cls. R., p. 571.)
In Hanover and Bavaria the redress is substantially the same. (5 id., p. 571.) In the republic of Switzerland the “ federal tribunal takes cognizance of suits between the Confederation, on the one side, and corporations or individuals on the other, when these corporations or private citizens are complainants, and the object of litigation is of the value of at least 3,000 francs.” Law 5th June, 1849; Lobsiger’s Case, (5 0. Cls. It., p. 0S7.) In Holland, the Netherlands, the Hanseatic Provinces, the free city of Hamburg, and probably in all countries which have inherited the perfected justice of the civil law, the government is in legal liability thus .subject to the citizen. Even in France, under the late empire, there was a less circumscribed means of redress, a more certain judicial remedy, a more effective method of enforcing the judgment recovered, than has been given to the American citizen, notwithstanding the pledge of the Constitution. Of all the governments of Europe, it is believed that Russia alone does not hold the state amenable in matters of property to the law. Of all the countries whose laws have been examined in this court, Spain only resembles the United States in fettering the judicial proceedings of her courts by restrictions and leaving the execution of their decrees dependent upon the legislative will. (Molina's Case, infra.) Yet, even in Spain, we know historically, back in the time of Ferdinand and Isabella, that the son of Columbus “did not succeed to Ms father's dignities till he had obtained a judgment in his favor against the Grown from the council of the Indias: an actf adds Prescott, “highly honorable to that tribunal, and showing that the independence of the courts of justice, the greatest bulwark of civil liberty, toas ivell maintained under King Ferdinand.” (Ferd. and Isabella, 3d vol., p. 245.) The records of this court also show *194 that- within the present century an American citizen recovered a judgment against Spain in a Spanish tribunal to the very large amount of $373,879 88, and that he elected to retain Spain as his debtor when the decree was about to be transferred to and assumed by the United States, and that his choice was judicious; for though thus transferred and assumed, the debt 1ms never been paid. Meades Case, (2 C. Cls. R., p. 225.)
But the law to which we most frequently resort — the law upon which our whole system of rights and liberties is founded — the common law of England, is before us. Deeply graven upon it are the maxims that the King can do no wrong, and that the Crown is not answerable for the tortious acts of its servants. But- did any court of England ever decline jurisdiction or deny justice under these maxims where a man’s goods or property had been taken unlawfully for the use of the state, or where his money was actually unlawfully retained in the King’s treasury?'
Consider, first, all the modern reported cases, where the petition of right has been denied, and there are but five of them.
In the Baron De Bode's Case (6 Dowling, Pr. R., 787; 8 Q. B., 208 ; 13 Q. B., 364 ; 3 Clarke, H. L. Cases, 469) the action was to recover out of a,n appropriation by Parliament, which was to be disposed of by certain commissioners constituting a special tribunal. "When the case was first heard at chambers it was complicated with various other questions, but as it passed through the Queen’s Bench and Exchequer Chamber these supernumerary questions, together with much unneeesary reasoning, dropped off, so that when it came to be decided in the House of Lords the decision was narrowed to this single point: “That the suppliant has no claim except under the statute and in the mode pointed out by its provisions."
The lord chief baron, who delivered the opinion, does not, indeed, call the commission a tribunal, nor pronounce its awards judgments; but he does say that the act of Parliament “ meant to provide for the application of the whole fund, and leave no part to be dealt with except under its exactments. Any claimant, therefore, upon the fund must proceed according to the provisions of the statute, and has no other remedy.”
In Viscount Canterbury v. The Attorney General, (1st Phill. Chanc. R., p. 306,) the action was for the negligence of the King’s servants in causing, indirectly, a fire, which consumed *195 the suppliant’s property; that was the sole ground of the action, it being claimed that the sovereign was responsible for the consequences of their negligence.
In Irwin v. Sir George Gray (3 Fost. & Fin., N. P. R., p. 635)— but see 16 Scott’s C. B. B., p. 368, where the case is stated— “the suppliant sought compensation in 1861 for a series of alleged wrongs in the course of legal proceedings beginning in 183-1.” “ The wrongs imputed were withholding from the juries certain letters; and the guilt of those wrongs was imputed to Mr. Littleton, Lord Morpeth, and Lord John Bussell, secretaries for Ireland, and the attorney general and the Crown solicitor, in Ireland at the time, respectively. The question to be tried would have been whether the wrongs were committed so as to damage the suppliant; that is, in effect, to try in 1861 whether some verdicts returned in l831-’35 were right, and if not, whether her present Majesty should compensate Mr. Irwin for the damage sustained in paying costs, and in being imprisoned and fined, and also in being disinherited by his father, by paying to him £100,000.”
The fourth of these cases is Tobin v. The Queen, (16 Scott’s C. B. R., p. 210.) This is a very great case in the ability with which it is discussed’, and the learning with which it is enlightened. It wms argued by Sir Boundell Palmer, attorney general, for the Crown, and Sir Hugh Cairns, for the suppliant. The decision was by the venerable lord chief justice of the Common Pleas, then in his seventy-second year, and one of the ablest of his life. All previous learning relative to the petition of right is embodied in this case, and all that has been- said upon the subject since is taken from it. Net the facts which called forth this great ability were simply these: “The commander of a Queen’s ship employed in the suppression of the slave trade on the coast of Africa seised a schooner belonging to the suppliant, which he suspected of being engaged in slave traffic; and it being inconvenient to talce her to a port for condemnation in a vice-admiralty court, earned her to be burned? It was “Geld that this was not a case for a petition of right; the remedy for the wrong, if a/ny were done, being against the person who did it,” upon the authority of Madrazo v. Willes, (3 B. and Ald., p. 353,) “ where the captain of a man-of-war destroying a Spanish ship wrongfully, but, as he believed, in performance of his duty, was held to be liable to the Spanish oioner to the amount of £20,000.” And the principle of *196 the case was the principle before established, that “ a petition of right toill not lie to recover compensation for a wrongful act done by a servant of the Grown in the supposed performance of his duty,” nor 11 to recover unliquidated damages for a trespass.”
Last of these rejected cases is that of Feather v. The Queen, (6 Best and Smith, Q. B. R., p. 257, 1895.) The case turns upon a patent for an invention and the construction long put upon the statute of monopolies, and holds that u where there are no express words to talce away from the Grown the right of using the invention,” there letters-patent will not preclude the Crown. The law as declared differs from American law in failing to recognize in the mind-work of the inventor an actual property.
Turn now to the instances in which the legal rights of a British subject to legal redress against the government are undisputed. u Replevin lies against the Icing,” says the modern work of Manning, u if goods be in his hand,” (Exch. Prac., p. 89.) “A man,” says the old work of Staundforde, “ shall have his petition for goods as well as for lands, as where the escheator seizeth goods of one who is outlawed, and hath accounted for them in the exchequer, and after the, outlawry is reversed, (Staund. Preerog., p. 72.) In the Queen’s Bench Lord Denman said: “ There is nothing to secure the Crown against committing the same species of wrong — unconscious and involuntary wrong — in respect to money, which founds the subject’s right to sue out his petition when committed, in respect to lands or specific chattels ; and there is an unconquerable repugnance to the suggestion that the door ought to be closed against all redress or .remedy for such wrong.” Be Bodds Case, (8 Q. B. It., p. 273.)
So we have the remedy maintainable against the Crown, though the form of the action against a subject would be ex delicto, viz, of replevin, as stated by Manning; of trover, in the case put by Staundforde; of trespass on the case and ejectment, in the instances suggested by Lord Denman. “But,” says the conclusive authority of Chief Justice Erie, in Tobin v. The Queen, (p.357,) “ whatever was the form of procediere, the substance seems always to have been the trial of the right of the subject as against the right of the Groton to property, or an interest in property which had been seized for the Groton; and, if the subject succeeded, the judgment only enabled him to recover possession of that specified, or the oalue thereof, if it had been converted to the King's use.” And that there mas^ be no doubt as to the breadth *197 and variety of the remedies given under the petition of right, I subjoin to this judgment of the Common Pleas the comment thereon of the Queen’s Bench • “ We concur with that court in thinking that the only cases in which the petition of right is open to the subject are where the land or goods or money of a subject have found their toay into the possession of the Grown, and the purpose of the petition is to obtain restitution, or, if restitution cannot be given, compensation in money; or inhere the claim arises out of a contract, or for goods supplied to the Grown for the public service Feather v. The Queen.
Admonished by the common law of England and by the jurisprudence of nearly the whole civilized world, we hold that this action of the claimants to recover of the government their own money unlawfully withheld by its officers is a suit founded in justice and in right. We believe'that it comports not with the honor, and dignity of a republic to refuse to its citizens legal redress where their money or goods are in its hands more than with the honor and dignity of a king. The legislative power has committed to this court the duty of giving such redress in all cases where the ¿laim is founded upon contract express, or upon contract implied, or upon a law of Congress. The act is remedial — to remedy great mischiefs and to avoid many'grievous wrongs. It deserves to be liberally construed, and so as to repress the mischief and advance the remedy. There is a certain modesty in courts declining doubtful jurisdiction which in ordinary cases is commendable and wise. But ordinary cases are those wherein the party may seek a certain jurisdiction elsewhere, and not cases where legal redress would utterly fail. In such, declining jurisdiction means denial of justice, and a decision which pronounces a.citizen having a legal right absolutely without legal redress is a decision abhorrent to the common law. In such doubtful cases, doubts are to be resolved in favor of right and justice.
But in speaking of this case as doubtful, let it not be under-derstood that we entertain doubts. We so speak simply in deference to the opinions of our brethren whose conclusions differ from our own. This case we think distinguishable clearly from those which spring from the tort or laches of a public officer. It arises not from the wrongful act of the Secretary, but from the continuous withholding by the defendants of the money of the claimants. It is an action founded upon ratifica *198 tion — the strongest ratification known to tlie law, where the principal comes into court still holding that which his agent took. It belongs to a class where the law regards the principal as having done and still continuing to do that which the agent did.
Shortly before the reorganization of this court Parliament passed an act known as u The petitions of right aet of 1860f or popularly from its learned author, the present chief justice of the Common Pleas, as uBoviWs Act,” (23 & 24 Viet., e. 34.) By it the creditor of the Crown was assured of all the remedies of the common law for lands occupied, for goods withheld, for property taken, for contracts broken, and under it he may take defaults against the Crown, recover costs and interest, and seek relief eith er in courts of law or courts of equity. The narrower legislation of the United States has restricted the jurisdiction of this court to cases of contract, expressed or implied. Where goods taken unlawfully are still in the possession of the government, this court cannot right the American citizen, like the court of Exchequer, by a writ of restitution, but it may give effect to the Constitution and hold that they were acquired by an implied contract.
The Court of Claims was established to give legal redress to the citizen as 'against the government where he would have had legal redress as against another citizen. We cannot give legal redress except upon legal principles. We cannot sustain a defence on the part of the government where, if set up by an ordinary defendant, it would be held illegal, inequitable, unconscionable. What would be said of a bank that came into court while still withholding the funds of a depositor and pleaded that the refusal to pay over was the tortious act of its cashier ? What would be thought o'f a common carrier who, while retaining possession of my goods, pretended that the conversion was merely the wrongful act of his agent $ Such is the position of the government in this suit, withholding money that does not belong to it, insisting that the wrong was its agent’s, though done on its behalf, and that the owner is without a remedy.
The government is not liable like the ordinary principal for the negligences and mistakes of its agents, and their authority is limited and defined by law, and the law is notice to all the world. But that defence cannot prevail where the government *199 adopts and ratifies tbe mistake, or receives and accepts die benefit of tbe unauthorized act. Therefore it does not lie in the mouths of the defendants in this suit to say that their Secretary’s act was illegal, and that they are not responsible for unlawful acts; because their Secretary acted in their name and strictly on their behalf, and they have retained the money which he withheld, and by a. chain of acts and succession of officers have ratified all that he did. Nor can they now sustain the position that the law contemplated the payment of abandoned and captured property decrees solely out of the abandoned and captured property fund. That defence comes too late, for they had the opportunity of paying the decree out of that fund when they kept' back a part, and have had that opportunity ever since, and might have tendered payment when this suit was brought and have pleaded tender and been protected, if necessary, by the court in having the payment made out of the proper fund. On the contrary, the defendants have not sought through their officers to pay, but to evade payment. They occupy the position of a trustee who, having converted a part of a trust estate, should set up in a proper action brought against him personally that he should not be required to answer for the misappropriation out of Iiis private funds. The defendants’ agents have made this money of the claimants a part of the national indebtedness. To allow the money of a citizen to be kept in the public Treasury without his fault or neglect, to sanction public officers through a mistake of law in taking private property against the' legislative will, to permit unlawful acts to control the law, would be to annul the highest purpose of Congress in establishing this court.
The judgment of the court- is, that the claimants recover of the defendants the sum of $723 32.

 Thus, the first case in. the first volume of the reports of this court (Gordon’s case, 1 C. Cls. R., p. 1) discloses these extraordinary facts: There was allowed to the claimant for property destroyed by United States troops $8,873; then $100 for an error of calculation in the first “award;” then $8,997 94 for interest; then $10,004 89 for more interest; then $39,217 50 for property previously found not to have been destroyed by United States troops; and, finally, $66,519 85 on a “ revision” of the previous awards. The Forty-First Congress revived this practice in the celebrated Chorpenning case, where the Postmaster General, in an ex parte arbitration on ex parte testimony, awarded the claimant $425,000. It is not generally known that the same claim had been brought by the claimant previously before the Court of Claims, where he demanded but $176,576, and where the suit was dismissed.