Nott, J.,
delivered, tbe opinion of the court:
Communal property is an estate which is neither national nor individual; that is to say, where the fee is vested neither in a person, or number of persons in their own right, nor in a body corporate ¡or politic. In this country it is substantially unknown, less so than in England, where a semblance to communal property in commons and right of common still has a practical existence.
It is indeed not improbable that many of our troubles with ■the Indian tribes have sprung from the fact that our treaty-making commissioners and agents were ignorant of its nature, and of the fact that all Indian lands were communal property. We have indeed in this country communities, so called, religious or social, but there the fee of real property is vested in an artificial person, a corporation, or in trustees. We have also joint tenants and tenants in common; but there the fee is in the individual or a number of individuals, and the estate of each passes, according to its nature, to his successor or his heirs. Apart from the Indian tribes communal property is. with us a thing unknown.
The distinctive characteristic of communal property is that every member of the community is an owner of it as such. He does not take as heir, or purchaser, or grantee; if he dies his right of property does not descend; if he removes from the community it expires; if he wishes to dispose of it he has nothing which he can convey; and yet he has a right of property in the land as perfect as that of any other person; and his children after him will enjoy all that he enjoyed, not as heirs but as communal owners. When the Government of the United States sells a tract of land no citizen has a direct personal interest in the property. He may as a matter of public policy approve of the sale or condemn it, but there is nothing in the land which he can call his own.
The Indian, on the contrary, acknowledges no authority in his chiefs and headmen to dispose of his individual rights as a communal owner; and even where a majority of a tribe sanction a sale, it is in his eyes the case of a majority taking away the property of the minority and disposing of it without their consent. The public domain of the United States is in legal effect the corporate property of the Government; the lands *303 of tbe Indian tribes are something in which every individual' of the community has a right of use and enjoyment as absolute- and complete as that of any other person in the world.
The constitution and laws of the Oherokees, since that people came within the confines of civilization, have followed, in a limited extent, the traditions and usages of the race, and have embodied in them in varying degrees the fundamental principle- and characteristics of communal property.
The preamble of their constitution, September 6, 1839, like-that of the Constitution of the United States, sets forth the-general purpose of the instrument:
“We, the people of the Cherokee Nation, in national convention assembled, in order to establish justice, insure tranquility, promote the common welfare, and to secure to ourselves and our posterity the blessings of freedom — acknowledging with humility and gratitude the goodness of the Sovereign Euler of the Universe in permitting us so to do, and imploring His aid and guidance in its accomplishment — do ordain and establish this constitution for the government of the-Cherokee Nation.”
The constitution then takes up (and it is most significant-that it does so by its first article) the subject of paramount importance in the Indian mind — of more importance than the form of government, than the right of representation, than the-right of trial by jury, or of habeas corpus, or of any of those-principles of civil liberty, which, in the "Anglo-Saxon mind are held supreme, the subject of their lands:
“ Sec. 2. The lands of the Cherokee Nation shall remain common property; but the improvements made thereon, and in the possession of the citizens of the Nation, are the exclusive- and indefeasible property of the citizens respectively who made or may rightfully be in possession of them: Provided,. That the citizens of the Nation possessing exclusive and indefeasible right to their improvements, as expressed in this-' article, shall possess no right or power to dispose of their improvements.in any manner whatever, to the United States, individual States, orto individual citizens thereof; and that whenever aDy citizen shall remove with his effects out of the limits, of this Nation, and become a citizen of any other government, all his rights and privileges as a citizen of this Nation shall cease: Provided, nevertheless, That the national council shall have power to readmit, by law, to all the rights of citizenship,, any such person or persons who may, at any time, desire to-return to the Nation, on memorializing the National Council for such readmission.
*304 “Moreover, the National Council shall have power to adopt such laws and regulations, as its wisdom may deem expedient and proper, to prevent citizens from monopolizing improvements with the view of speculation.”
The amendment of 1866 modifies the foregoing as follows :
“ Sec. 2. The lands of the Cherokee Nation shall remain common property until the National Council shall request the survey and allotment of the same, an accordance with the provisions of article 20th of the treaty of 19th of July, 1866, between the United States and the Cherokee Nation.”
With these restrictive provisions should be considered the brief grant which the constitution contains of legislative power :
“ Sec. 14. The National Council shall have power to make all laws and regulations which they shall deem necessary and proper for the good of the Nation, which shall not be contrary to this Constitution.”
The legislation of the Cherokees recognizes again and again the communal character of the seizin or occupancy of the land. It is not “lawful for any citizen of the Cherokee Nation to sell any farm or other improvement in said nation to any person other than to a ‘bona fide’ citizen thereof;” nor “to rent any farm or other improvement to any other person than a citizen of the Indian Territory.” (Eevised Code, 1874, Art. m, sec. 112, p. 234.) “No person shall be permitted to settle or erect any improvement within one-fourth of a mile of the house, field, or other improvement of another citizen without his, her, or their consent, under the penalty of forfeiting such improvement and labor for the benefit of the original settler; provided, it may be lawful however, where a settler has a field one-half mile or more from his residence, and where there may be a spring or rünning water and timber, for another citizen to improve and settle one hundred yards from such field so situated.” (Act 2ith September, 1839, id., p. 249.)
The law regulating intermarriage with white men or foreigners provides that should a citizen of the United States or any foreign country “become a citizen of the Cherokee Nation by intermarriage” and be left a widower, he shall continue to enjoy the rights of citizenship unless he shall marry a person “having no rights of Cherokee citizenship by blood; in that case, all of his rights acquired under the provisions of this act shall cease.” (Revised Code, 1874, Art. xv, sec. 74, p. 223.) *305 If be abandons bis wife, be “shall thereby forfeit every right and privilege of citizenship,” and shall “be removed from the Nation.” (Sec. 75.) There is also a significant provision attached to the law allowing citizenship by intermarriage which shows how clearly the communal character of the property of the Nation is recognized; that is to say, property of which all the citizens of the nation are joint owners and in which each has a direct personal interest:
“ Provided, also, That the rights and privileges herein conferred shall not extend to right of soil or interest in the vested funds of this Nation, unless such adopted citizen shall pay into the general fund of the national treasury, a sum of money to be ascertained and fixed by the national council, equal to the ‘pro rata’ share of each native Cherokee, in the lands and vested wealth of the Nation, estimated at five hundred dollars ” (id., p. 224).
With these inbred views concerning their communal property and this traditional belief in their own direct personal interest in all property held by the nation, it is not a matter for wonder that a controversy should have arisen between those who are Cherokees by blood and those who are Cherokees by adoption. This controversy, so far as it is involved in the present Case, relates to the proceeds of lands sold by the nation to the United States, and to the rents of lands leased for grazing purposes to certain so-called cattle associations, and to moneys derived from the sale of property, but held in trust for the benefit of the Cherokee Nation by the United States. The controversy is brought before the court by a suit in which the Delawares, who became members of the Cherokee Nation in 1867, are claimants in fact, and the Cherokee Nation is defendant.
The United States, as trustees of one or both of the parties, are also joined as defendants, and all of the parties have appeared and been heard by counsel. The jurisdiction of the court is derived from an act of Congress (Act 1st October, 1890, 26 Stat. L., 636), empowering the court “to hear and determine what are the just rights in law or in equity of the Shawnee and Delaware Indians, who are settled and incorporated into the Cherokee Nation,” and from the voluntary appearance of the respective parties. It should be noted that the idea of subjecting these foreign litigants to the jurisdiction of this court did not originate in Congress. The proposition to submit the *306 controversy to tbe arbitrament of the judiciary of the United States came from the Cherokee Nation in a communication addressed by their delegates to the Senate Committee on Indian Affairs, June 10, 1890. It should also be noted that the laws of the Cherokees recognize the liability of the government to the suit of the citizen without limitation or restriction, going even to the full extent of the civil law. Brown's Case (6 C. Cls. R., 171, 193).
The Cherokee Nation shall be liable to all persons whatever,, citizens of the Nation, having claims at law or equity against her, to the same extent as individual persons are liable to each other, and may be sued by any citizen having a cause of action.. (Code 1874, p. 240, Sec. 130.)
The claim of the Delawares springs out of an agreement dated the 8th April, 1867, whereby they were admitted into and became a part of the Cherokee Nation. Without adverting to particular words and phrases, it is manifest that that agreement was made for the attainment of three principal objects: First, for the purchase by the Delawares of homes within the-Cherokee country; second, for their joint ownership and equal participation in the national fund held in trust by the-United States for the benefit of the Cherokees; third, for the adoption of the Delawares and their children after them as “ members of the Cherokee Nation with the same rights and immunities” “as native Cherokees.”
This instrument so brought before the court for construction is a contract entered into by two parties of communal owners, and its subject of bargain and sale consists of two kinds of communal property. One of these was a fund in the Treasury held by the G-overnment of the United States in trust tor the benefit of the Cherokee people. It had been derived from the sale of Cherokee lands, and had been reserved from moneys which would otherwise have been paid per capita to the communal owners; and it represented and was in every sense, if not in form, the communal property of the Cherokee people. Manifestly, if the Delawares were to be incoporated into and become a p&rt of the Cherokee Nation with all the rights and immunities of native Cherokees, it would be but just that they should contribute to this fund in whose benefits they would share.
The agreement accordingly provides that the Delawares *307 shall contribute a proportionate amount and be thereafter jointly and severally and equally interested with the Cherokees in the augmented fund. The numbers of the communal owners was fixed or made ascertainable by the agreement, the amount of the primary fund in the treasury was known, the amount to be paid in was a simple matter of calculation, and the result was that the arrangement left the individual interests of the communal owners precisely what they were before, each Delaware and each Cherokee continuing to receive, directly or indirectly, per capita that same dividend that he would have received if the merger of their funds had not taken place. This part of the agreement has not been susceptible of misconstruction and concerning it no controversy has arisen.
There being thus established one communal fund to which all were to contribute equally and in which all were equally to share, the agreement further provides for the sale of land in the Cherokee country to the Delawares, which should furnish homesteads for these new inhabitants and future citizens of "the Cherokee Nation; and it is this part of the agreement from which the controversy of the case has sprung.
This land which the Cherokees “ agree to sell to the Delawares for their occupancy” is to be enough for the agricultural homes of the new inhabitants and no more. The quantity is fixed at and limited to “ one hundred and sixty acres of land for each individual of the Delaware tribe”; that is, “of the Delawares who elect to remove to the Indian country.’” The “ selections of the lands to be purchased by the Delawares may be made by said Delawares in any part of the Cherokee Beservation, east of the line of the ninety-sixth degree of west longitude,-not already selected and'in the possession of other parties.”
In case of the future allotment of land contemplated by the first amendment of the Constitution, 1806 {supra), and the twentieth article of the treaty with the United States, 1866, “it is agreed that the aggregate amount of land herein provided for the Delawares, to include their improvements according to the legal subdivisions, when surveys are made (that is to say, 160 acres for each individual), shall be guarantied to each Delaware incorporated by these articles into the Cherokee Nation.” It is also guarantied that “the continued ownership *308 and occupancy of said lands by any Delaware” shall not “be interfered with in any manner whatever without his consent, but shall be subject to the same conditions and restrictions as are by the laws of the Cherokee Nation imposed upon the native citizens thereof. ” Finally, while individual rights are guarantied and the future allotment of land in severalty is contemplated, the present communal character of the estate granted is carefully guarded by a general proviso, “that’ nothing herein shall confer the right to alienate, convey, or dispose of any guch lands, except in accordance with the constitution and laws of said Cherokee Nation.”
We may pause for a moment here to analyze the results of this agreement. The occupancy and right of occupancy of the lands sold, together with the buildings which might be attached to the freehold, i. e., all “ improvements,” as they are popularly termed, were to be the individual property of the purchasers ; the estate in the land was to remain communal and continue subject to the constitution and laws of the Cher-, okees ; in case of a future allotment of lands within the Cherokee Nation these were to be allotted exclusively to the Delawares.
It seems plain to the court that this part of the agreement is for the sale of a specific thing for a specific price. It indeed merely fixes the rate per acre at which land may be purchased, and leaves the Delawares free (within certain restrictions) to take as much or as little as they needed. If they took 50,000 acres they would pay $50,000; if they took 51,000 acres they would pay $51,000. As a matter of fact, they took 157,600 acres and paid $157,600. The money was the consideration named for the land, and the land the consideration named for the money. The Clierokees as grantors conveyed no right or interest other than in the lands sold, and the Delawares as grantees acquired no right or interest in lands other than those for which they paid. As to the communal element of the estate conveyed, considered in the abstract, it is manifest that while the lands granted remained communal they were not owned in common by the Clierokees.
The right of occupancy and the remote right.to the fee were both vested in the Delawares. The agreement expressly excluded the Clierokees from any right of property in the lands of the Delawares, and by implication (in the absence of a pro *309 vision to the contrary) excluded tlie Delawares from any right of property in the lands of the Cherokees. After it was executed and its covenants performed, there would be two communities in the Cherokee country, and each in the matter of property, so far as the agreement was involved, would be independent of the other; but the property rights of both would be subject to the constitution of the Cherokee Nation, and (within constitutional limitations) to the laws of the Cherokee government.
The facts and circumstances attendant on the transaction, and which were known to the contracting parties when they entered into the agreement, sustain the construction that the court is constrained to give to it. They have been set forth with vigor and clearness in the communication from the delegates of the Cherokee Nation to the Committee on Indian Affairs of the Senate, before cited, from which we extract the following paragraph:
“As has been seen, the Delawares purchased 157,600 acres of Cherokee lands lying east of the 96th degree. That was an absolute and unconditional purchase, and in which lands the Cherokee Nation has no title or interest. Again, the fund of the Cherokee Nation in which the Delawares were to share was fixed at $1,678,000.
“It is estimated, taking $1.25 per acre for the land as a basis of valuation, that the wealth of the Cherokee Nation at the date of the agreement was:
‘Strip' lands, ceded by the 17th article of the treaty of 1866, over 400,000 acres. $500,000
‘Neutral’ lands ceded by same article. 1, 000,000
Lands lying west of the 96th degree, about 8,000,000 acres .. 10, 000, 000
Land east of the 96th degree, about 5,000,000 acres. 6, 250, 000
National fund.:. 678, 000
Malting a total of. 18,428,000
“At the same time the population of the Cherokee Nation was about 13,000, making a per capita wealth of $1,416. By adding to the national wealth of the Cherokees the amount received from the Delawares and the Shawnees, we find a total of $18,757,424, and by adding the population of these two tribes to that of the Cherokees the number will be found to be 14,757, and a division will show a per capita wealth of something over $1,200. Now, it seems absurd to sa.y that the Cherokee people were willing and so ignorant as to diminish their per capita wealth from $1,400 to $1,200, and give to the Delawares a per capita wealth of $1,200 for $123.00, and to the Shawnees a like per capita wealth for the sum of $19.00, *310 and at the same time permit these two tribes to share in the funds which they paid as a consideration for the rights and privileges with the Oherokees. We submit that no such inequality and injustice was ever intended. If such was the intention, why was not the value of the Cherokee ‘Strip’ lands in Kansas, which were being disposed of for the benefit of the Oherokees at the same time and under the same article of the treaty that the neutral lands were being disposed of, and also the Cherokee ‘Outlet’lands, added to the Cherokee national fund as a basis for calculating the amount to be paid to the Oherokees by these people?”
This statement must not be taken without some modification. There were, indeed, at the time two tracts of land, the Cherokee Strip and the Neutral Lands, which the United States were to survey and sell to their own citizens for the benefit of the Oherokees. What was to be done with the proceeds of the Cherokee Strip was not a subject of stipulation between the Oherokees and Delawares. It may have been understood or expected that they would be paid into the treasury of the Nation and used or held for governmental purposes, and not distributed to or funded for the benefit of the Oherokees as communal owners. Such,- indeed, was the fact.
Out of a total of $523,873, which was derived from the sales of lands in the Cherokee Strip, $25,000 was appropriated to an asylum and $401,559 was used for general governmental purposes, and none was set aside for the exclusive benefit of the communal owners, the Oherokees. The “neutral lands,” whose avails were to augment the national fund, were estimated in the agreement as of the value of $1,000,000, and the Delawares paid in their proportion upon that basis, although the avails might not augment the fund for several years, and the treaty authorized a sale in mass for $800,000. Sales were contemplated by the treaty, I860 (article 16), in the great body of land lying west of the ninety-sixth degree, commonly known as the “ Cherokee Outlet,” but these sales were restricted to “ friendly Indians,” “not exceeding 160 acres for each member of each of said tribes thus to be settled,” — and the value of the mass of 8,000,000 acres in 1866 could not well have been as much as $10,000,000.
The statement, in a word, is a clear and forcible presentation of the facts from the present Cherokee point of view. Nevertheless, after all due allowances have been made, it is apparent that the Delawares retained their separate national *311 fund of $889,191 in the Treasury of the United States as their separate property, and that the property of the Cherokees vastly exceeded that which they contributed to the communal estate and the consideration which they paid for a foothold in the Cherokee country. Moreover, as citizens of the Nation they have had the benefit of the moneys derived from the Cherokee Strip, and the national fund has been augmented and augumented until it now amounts to $2,636,634, and to this augmentation the Delawares as Delawares have contributed nothing.
But there is another part of this controversy which has caused more doubt and which how brings the court to a different conclusion.
The agreement of 1867, which we have been considering as a mere contract, was something more than a deed of bargain and sale, viz, a treaty. After being executed by the delegates of the Nation it was “ratified by the National Committee June 15, 1867.” (Laws of the Cherokee Nation, p. 281.) By this treaty two independent bodies politic united and became one, the lesser, according to its terms, being merged in the greater. The compact regulated and guaranteed the individual and political rights of those who surrendered their independent corporate existence and became members of the Cherokee nationality. It assured them of something more than mere residence and rights of property upon Cherokee territory, viz, that upon their enrollment and compliance with the conditions and stipulations of the agreement “all of the members of the tribe, registered as above provided, shall become members of the Cherokee Nation, with the same rights and immunities” “as native Cherokees.”
What, then, were these “rights and immunities” which the Delawares acquired by becoming “members of the Cherokee Nation?”
The constitution, in its first article (before quoted), uses the term “citizens,” and a subsequent provision prescribes and declares who the citizens of the h) ation shall be:
“ Sec. 5. No person shall be eligible to a seat in the National Council but a free Cherokee male citizen who shall have attained to the age of twenty-five years.
“The descendants of Cherokee men by all free women, except the African race, whose parents may have been living together as man and wife, according to the customs and laws *312 of this Nation, shall be entitled to all the rights and privileges of this Nation, as well as the posterity of Cherokee women by all free men. No person who is of negro or mulatto parentage, either by the father’s or the mother’s side, shall be eligible to hold any office of profit, honor, or trust under this government.”
At that time, therefore, the right of citizenship was strictly limited to native Cherokees of Cherokee descent. By the amendments of 1866 the requirements of citizenship were changed :
“ Sec. 5. No person shall be .eligible to a seat in the National Council but a male citizen of the Cherokee Nation, who shall have attained to the age of twenty-five years, and who' shall have been a bona fide resident of the district in which hé may be elected at least six months immediately preceding such election. All native born Cherokees, all Indians, and whites legally members of the nation by adoption, and all freedmen who have been liberated by voluntary act of their former owners or by law, as well as free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months from the 19th day of July, 1866, and their descendants, who reside within the limits of the Cherokee Nation, shall be taken and-deemed to be citizens of the Cherokee Nation.”
Therefore the Delawares, according to the express terms of the treaty of union, that is to say, the agreement of 1867, became “ members of the Cherokee Nation with the same rights and immunities as native Cherokees f and according to the then existing constitution, the amendment of November 29, 1866, “ all Indians,” “legally members of the Nation by adoption” are classed with “native born Cherokees,” and shall be “taken and deemed to be citizens of the Cherokee Nation.” The Delawares were Indians; they became “legally members of the Nation by adoption;” they must be “taken and deemed to be citizens” identical in all constitutional rights with “native-born Cherokees.”
The resulting question, therefore, which is thus brought be- ■ fore the court for determination is, what were these constitutional “rights and privileges” of the Delawares as adopted citizens of the Cherokee Nation?
Herbert Spencer has said, “Did primitive communal ownership survive, there would survive the primitive control of the uses to be made of land.” (The Man v. The State, p. 386, ed. 1892.) In the Cherokee country the converse of this is the *313 condition of affairs. “The primitive control of the uses to be made of land” bas passed from the communal owners and become lodged in the State — that is to say, in the government of the nation — and the communal owners as such exercise no more control over the national territory than the citizens of the United States exercise over the public lands of the United States. Of this the statutes of the Oherokees afford overwhelming evidence.
The constitution, as before quoted, recognizes a right of occupancy under the name of “improvements” as “an exclusive and indefeasible property ” in citizens rightfully in possession, but at the same time expressly vests in the National Council “power to adopt such laws and regulations as its wisdom may deem expedient and proper to prevent citizens from monopolizing improvements [i. e. occupancy] with the view of speculation.” A statute contemporaneous with the constitution is entitled “An act regulating settlements on the public domain.”' (Act Sept. 24,1839, Laws of the Cherokee Nation, ed. 1875, p. 249). A statute for the preservation of trees refers to trees-“standing and growing upon the public domain” (id., p. 143, § 67). The Act 14th December, 1870 (id., p. 252), declares the conditions upon which railroad ties and other material shall “ be furnished from the public domain.” The Act 17th December, 1869 (id., p. 255), is entitled “An act for the protection of the public domain,” and the Act 14th December, 1870 (id., p. 257),. “An act in relation to the public domain.”
All of these statutes and many others justify by their provisions the use of the term “Public Domain.” A statute relating to minerals declares that “All gold, silver, lead, copper, iron, stone coal, petroleum, salt, or medicinal water,” which has been or may be discovered within the limits of the country, “is the property of the Cherokee Nation,” and provides for the leasing of mines, petroleum beds, salt works, and of mineral springs (id., 226). The act regulating settlements on the public domain declares that if they be left unoccupied they shall “ revert to the Nation as common property ” (id., p. 249). The statute for the preservation of trees makes it a misdemeanor to cut down, kill, or destroy any fruit or nut-bearing tree “ standing and growing upon the public domain of the Cherokee Nation” (id., p. 143). The act relating to railroad ties-imposes a royalty to be paid for taking timber from the public *314 domain or stone from tie quarries of tie Nation (id., p. 252). The act for tie protection of the public domain requires a citizen to take out a license before lie can dispose of sawed lumber, and to pay into tie treasury 15 per cent of the money he receives for it (id., p. 255). The act in relation to the public domain provides that at each and every station along the line of any railroad passing through “the lands of the Cherokee Nation there shall be reserved to the Cherokee Nation one mile square,” and that these tracts so reserved “shall be laid off into town lots and sold at public sale to the highest bidder,” who shall acquire thereby no other rights “than those of use and occupancy,” “provided that this act shall not be so construed as to interfere with any of the mineral resources of the public domain” (id., p. 257). The act for the support and education of orphan children empowers the trustees “to' occupy .and hold as much land, not exceeding two miles square, as they may deem necessary for farming, and mechanical purposes” (id., p. 258). The act authorizing the transfer or sale ■of Cherokee lands west of the Arkansas authorizes the sale ■of “all the Cherokee lands” “commonly known as the Cherokee Outlet.” The act 19th May, 1883, recognizes “the unoccupied lands belonging to the Cherokee Nation” as having been set apart by a previous statute “to produce revenue from .grazing,” and authorizes and directs the Principal Chief “to execute a lease for all the unoccupied lands of the Cherokee Nation” west of the Arkansas. And other statutes and treaties have recognized and exercised the power of absolute sale and alienation without authority from or ratification by communal owners.
With this power of regulation and control of the public domain a,nd the jus Msponendi lodged in the government of the Nation, it is plain that the communal element has been reduced to a minimum and exists only in the oe-•cupied lands. And it is manifest that with the growth of civilization, with all of its intricacies, and manifold requirements, the communal management of the public domain would have been utterly insufficient, and if it had continued would have been a barrier to the advancement of civilization itself.
With these powers of absolute ownership lodged in the ■Cherokee government, the power to alienate, the power to lease, the power to grant rights of occupancy, the power to *315 restrict rights of occupancy, and with the exercise of those powers running back to the very year of the adoption of the constitution, and receiving from that time to the present, the unquestioning acquiescence of the former communal owners, the Cherokee people, it is apparent that the “public domain” •of the Cherokee Nation is analogous to the “public lands” •of the United States or the “ demesne lands of the Crown,” and that it is held absolutely by the Cherokee government, as all public property is held, a trust for governmental purposes and to promote the general welfare.
A strong argument in favor of the Cherokee Nation undoubtedly might be made upon the assumption that so long as the public domain is held and used for public purposes it must be held and used for the benefit of all citizens, but that whenever it shall cease to be held as public property and be surrendered to its communal owners it must be restored to those from whom it was taken, to those who were in fact and not constructively the owners, and who in equity and right are entitled to it or to its proceeds5 just as land which is no longer used for a public road is not sold for the benefit of the community, but reverts to the specific owners from whom it was taken for public uses; and that the means and methods for making the distribution and the ascertainment of the former ■or actual parties entitled to the fund are matters necessarily and properly within the legislative discretion of the National ■Council. To these propositions there are in the opinion of the court two answers:
First. The constitution declares that “the lands of the Cherokee Nation shall remain common property.” The context shows that this brief provision was intended to place two restrictions upon the legislative power: First, the fee in the lands of the Gherokees was not to be given away to individuals and corporations as the lands of the United States have been given; second, the holding of the fee by the Cherokee government was not absolute but as “common property.” By the term “common property” was undoubtedly intended that the lands should be held for the general welfare of all persons entitle'd to share in the “rights and privileges” declared and established by the constitution — that is to say, of all Cherokee citizens.
The constitution was not a statute to run for a day or- a year, but a supreme law which was to continue, with occasional modi *316 fications, and regulate and assure tbe civil and political and personal rights of Oberokee citizens for all time. The persons who were equally entitled-to its benefits in 1839 were the citizens of the Cherokee Fation then in being; and the persons who were entitled to its benefits in 1883 or in 1890 were the citizens of the Cherokee Nation then in being. A common property in the lands of the Cherokee Nation was one of those rights and privileges, and being such could not be divested or extinguished by the legislative power.
Second. The treaty or agreement with the Delawares of 1867 provides that “the children hereafter born of such Delawares so incorporated into the Cherokee Nation shall in all respects be regarded as native Cherokees.” The amendment to the constitution of 1866 classifies all citizens as (1) “native-born Cherokees,” (2) Indians by adoption, (3) whites by adoption, (4) freedmen liberated by the voluntary act of their owners or by law, and (5) free colored persons. When the agreement declared that all children born after the Delawares became citizens of the Cherokee Nation should “be regarded as native Cherokees,” it placed them with the “native-born Oherokees” of the amendment — that is to say, it declared that they should be regarded as children of Cherokee blood. Since this agreement was entered into more than a quarter of a century has passed away, and it must be assumed that nearly half of the citizens of the Cherokee Nation have been born during this period. As against these who are of Delaware parentage no’ possible discrimination can be made either under the constitution or under the agreement.
We have spoken of the Oherokees as possessed of a superior equity in this money in their character of communal owners to the Delawares. But, in fact, no such equity exists. The Oher-okees are selling the heritage of their fathers and the patrimony of their children, and dividing the money among the present generations — that is, among themselves — instead of funding it as a part of their national resources for the welfare of those who are to come after them; and this despite the obligation which rests upon generations and individuals to transmit to their posterity as much as they have inherited from their ancestors.
The Delawares when they entered into the agreement had no right to expect that the lands of the Cherokees would be sold *317 and that they would be admitted to share in the proceeds by virtue of either their purchase or their citizenship. They can not now say that they were induced to enter into the agreement on the faith bf any, such expectation. But they had a right to expect that that which the laws of the Oherokees defined as “the public domain” would continue to be held and used for national purposes and the general welfare; and they certainly could not have anticipated or been bound to anticipate that the public domain of the Nation would be diverted from public to private uses and its proceeds be divided among a portion of the people to the exclusion of themselves.
Moreover, it is equally apparent that no such expectation existed on the part of the Oherokees. They guarded their national fund and provided for its enlargement and for the disposition to be made of the money to be derived from the sale of the neutral lands; and they -required the Delawares to contribute to the national fund on the basis of this augmentation; and they admitted them to become “members of the Cherokee Nation with the same rights and immunities and the same participation in the national funds as native Oherokees; ” and they agreed that “ children hereafter born of such Delawares shall in all respects be regarded as native Oherokees,” and yet they did not, by one line or one sentence reserve to themselves an exclusive right in the public domain, or provide for the contingency of a sale of more than half of their then national territory.
The present condition of affairs is not a casus omissus, but an afterthought — a new element which did not exist when the agreement was made; a new condition of affairs which has been created since by the act of one of the parties. It is true that if the public domain or its proceeds had been wholly reserved for public purposes, the Delawares would participate as citizens in many benefits — in immense benefits for which they did not pay; but their case would be like that of all immigrants coming into all civilized countries, who reap where they have not sown, and acquire a common interest in the common property without the payment of an equivalent in money.
The constitution of the Oherokees was a wonderful adaptation to the circumstances and conditions of the time, and to a civilization that was yet to come. It was framed and adopted *318 by a people some of wliom were still in tire savage state, and the better portion of whom had just entered upon that stage of civilization which is characterized by industrial pursuits; and it was framed during a period of extraordinary turmoil and civil discord, when the greater part of the Cherokee people had just been driven by military force from their mountains and valleys in Georgia, and been brought by enforced immigration into the country of the Western Cherokees; when a condition of anarchy and civil war reigned in the territory — a condition which was to continue until the two branches of the nation should be united under the treaty of 1846 (27 C. Cls. R., 1);. yet for more than half a century it has met the requirements-of a race steadily advancing in prosperity and education and enlightenment so well that it has needed, so far as they are concerned, no material alteration or amendment, and deserves-to be classed among the few great works of intelligent statesmanship which outlive their own time and continue through succeeding generations to assure the rights and guide the destinies of men. And it is not the least of the successes of the constitution of the Cherokees that the judiciary of another nation are able, with'entire confidence in the clearness and wisdom of its provisions, to administer it for the protection of Cherokee citizens and the maintenance of their personal and political rights.
Besting its conclusion upon the constitution, the court is of the opinion that all citizens of the Cherokee Nation must be regarded in the administration of their constitutional rights, civil, political, and personal, as Cherokees; that the National Council is in effect prohibited by the constitution from making discriminations concerning the common property of the Nation between different classes of citizens, and is without power, in the administration of its trust, to perceive differences which exist only in race or blood; that so much of the-acts 18th May, 1883, and 25th November, 1890, as restricts the payment of funds which were derived from the public domain,, to “citizens of the Cherokee Nation by blood,” is unconstitutional and void; and that the plaintiffs in this suit are entitled to participate in those funds as if no such restriction had been enacted.
In view of the fact that this case is in legal effect a suit in equity which may be followed by a decree for specific per- *319 formarme, by injunction or other equitable remedy, and that the evidence consists entirely of statutes, treaties, and public-documents involving construction, the court will not file a finding of facts; but the agreed statement of facts and such other evidence as may be desired by any party will be certified to the Supreme Court.
The court will hear counsel as to the form of the decree to be entered in accordance with this decision; and in the meantime the entry of judgment will be suspended.
The following decree was entered on the 22d May, 1893 :
This cause coming on to be heard upon the petition, answers,, agreed facts, proofs, and arguments submitted by the parties, respectively, and the court having heard the same, and considered the just rights in law and equity of the Delaware? Indians who are settled and incorporated into the Cherokee Nation, in pursuance of the authority vested in the court by the act of Congress entitled “An act to refer to the Court of Claims certain claims of the Shawnee and Delaware Indians,, and the freedmen of the Cherokee Nation, and for other purposes,” approved October 1,1890;
And it appearing to the court that under the provision of article 15 of the treaty of July 19, 1866 (14 Stat. L., p. 799),.’ and the agreement made by and between the Cherokee Nation and the Delaware Indians, dated the 8th day of April, 1867,' approved by the President the 11th day of the same month, the said Delaware Indians were admitted into and became a part of the Cherokee Nation entitled to equal rights and immunities and to participation in the Cherokee national funds and common property in the same manner and to the same extent as Cherokee citizens of Cherokee blood;
It is ordered, adjudged, and decreed that so much of the acts of the Cherokee national council of May 18,1883, and of November 25,1890, as restricts the distribution of funds which were derived from the public domain to citizens of the nation by blood, be held and deemed contrary to and in derogation of the constitution of the Cherokee Nation, and that the said. Cherokee Nation, or its trustees, the United States, account for, render, and pay to the said Delawares out of any funds of the said nation in its national treasury, or in the custody of the United States as trustees, not specifically appropriated *320 by law to other purposes, or out of funds that may hereafter «orne to the possession of said trustees belonging to the Cherokee Nation, a sum equal to the aggregate amount which the Delawares would have received if the before-mentioned unconstitutional restrictions in said statutes had not existed.
And it is further adjudged and decreed that the claimants in this suit and those whom they represent, being citizens of the Cherokee Nation, of Delaware blood or parentage, be adjudged and decreed to be entitled to participate hereafter in the common property of the Cherokee Nation in the same manner and to the same extent as Cherokee citizens of Cherokee blood or parentage may be entitled, and that in the distribution of the proceeds and avails of the public domain, or common property of the nation among the citizens thereof by distribution per capita at any time hereafter, the defendants The Cherokee Nation and the defendants The United States as trustees of The Cherokee Nation be enjoined and prohibited from making any discrimination between Cherokee citizens of Cherokee blood or parentage and Cherokee citizens of Delaware blood or parentage to the injury or prejudice of the latter.
And it is further adjudged and decreed as to the participation of the Delawares in the two funds referred to in the two statutes of the Cherokee Nation hereinbefore declared to be unconstitutional, which sums amount in the aggregate to $600,000, that such distribution shall be based on the agreed census of the native and adopted citizens as ascertained and agreed upon, to wit, 26,771, being taken as the whole number of Cherokee citizens oí all descriptions, and the said Delawares being taken as 759 of said whole number, and that the fund so ascertained, to wit, the sum of $17,011, be paid by the treasurer of the Cherokee Nation or by the Secretary of the Interior of the United States to the individual Delawares, per capita, who would have been entitled to the same if the unconstitutional restrictions and discriminations in said statutes had not existed.
And it is further ordered, adjudged,' and decreed that the respondent, The Cherokee Nation, pay the cpsts of this suit.
And it is further ordered, adjudged, and decreed that the compensation to be paid to the attorney and solicitor of the complainants in this cause be 10 per centum of the amount that the said complainants shall receive under this decree, *321 which compensation is hereby ordered to be paid upon the adjustment and receipt of the amounts as ascertained and paid over or set apart to said Delawares, to wit, 10 per centum of $17,011, being $1,701.10. And that if any further recovery be had under this decree, the right of the' claimants’ attorney to' further costs and allowances be reserved to be hereafter determined and fixed by the court.
And it is further ordered and decreed that if the judgment hereinbefore declared be not carried out and satisfied within six months from the time a copy of this decree shall have been served' on and delivered to the principal chief of the Oherokees and the Secretary of the Interior of the United States, the claimants may apply to the court for such further order, relief, or remedy as may be meet.