WeldoN, J.,
delivered the opinion of the court:
By authority of an act of Congress approved June 28,1898, entitled “An act for the protection of the people of the Indian Territory, and for other purposes” (30 Stat. L., 190), the Delaware Indians residing in the Cherokee Nation were authorized and empowered to bring suit in the Court of Claims within sixty days after the passage of said act against the Cherokee Nation for the purpose of determining the rights of. said Delaware Indians in and to the lands and funds of said nation under their contract and agreement with the Cherokee Nation, dated April 8, 186T.
The twenty-fifth section of said act is as follows, to wit:
“That before any allotment shall be made of lands in the Cherokee Nation there shall be segregated therefrom by the commission heretofore mentioned, in separate allotments or otherwise, the one hundred and fifty-seven thousand six hundred acres purchased by the Delaware tribe of Indians from the Cherokee Nation under agreement of April eighth, eighteen hundred and sixty-seven, subject to the judicial determination of the rights of said descendants and the Cherokee Nation under said agreement. That the Delaware Indians residing in the Cherokee Nation are hereby authorized and empowered to bring suit in the Court of Claims of the United States, within sixty days after the passage of this act, against the Cherokee Nation, for the purpose of determing the rights of said Delaware Indians in and to the lands and funds of said nation, under their contract and agreement with the Cherokee Nation, dated April eighth, eighteen hundred and sixty-seven; or the Cherokee Nation may bring a like suit against said Delaware Indians; and jurisdiction is conferred on said court to adjudicate and fully determine the same, with right of appeal to either party to the Supreme Court of the United States.”
In pursuance of the provisions of said statute the complainants, the Delaware Indians, filed a petition within the time limited in the statute, in which petition are alleged certain rights of the Delaware Indians and the violation of *237 those rights bjr the Cherokee Nation. To the petition the defendant Cherokee Nation tiled an answer admitting- some of the allegations of the complainants and denying others which will be hereafter noted.
In the fourth article of the petition it is averred that on the 8th of April, 1867, articles of agreement were made between the Cherokee Nation, represented by certain delegates duly authorized as parties of the first part, and the Delaware tribe of Indians represented by proper delegates duly authorized, as parties of • the second part, which agreement was approved by the President of the United States April 11,1867. The material'portions of such agreement are as follows: .
“ Whereas by the fifteenth article of a certain treaty between the United States and Cherokee Nation, ratified August 11, 1866, certain terms were provided, under which friendly Indians might be settled upon unoccupied lands in the Cherokee country'east of the line of 96° of west longitude, the price to be paid for such lands to be agreed on by the Indians to be thus located and the Cherokee Nation, subject to the approval of the President of the United States; and whereas by a treaty between the United States and the Delaware tribe of Indians, ratified August 10, 1866, the removal of the said Delawares to the Indian country south of Kansas was provided for; and, in the fourth article whereof, an agreement was made by the United States to sell to the Delawares a tract of land, being part of a tract the cession of which by the Cherokees to the United States was then contemplated; and-whereas no such cession of land was made by the Cherokees to the United States, but, in lieu thereof, terms were provided, as hereinbefore mentioned, under which friendly Indians might be settled upon their lands; and whereas a full and free conference has been had between the representatives of the Cherokees and the Delawares, in view of the treaties herein referred to, looking to a location of the Delawares upon the Cherokee lands and their consolidation with said Cherokee Nation:
“Now, therefore, it is agreed between the parties hereto, subject to the approval of the President of the United States, as follows:
“The Cherokees, parties of the first part, for and in consideration of certain payments, and the fulfillment of certain conditions hereinafter mentioned, agree to sell to the Delawares, for their occupancy, a quantity of land east of the line *238 of the 96° west longitude, in the aggregate equal to one hundred and sixty acres for each individual of the Delaware tribe, who has been enrolled upon a certain register made February 18, 1867, by the Delaware agent, and on file in the Office of Indian Affairs, being the list of Delawares who elect to remove to the ‘Indian country,’ to which list may be added, only with the consent of the Delaware council, the names of such other Delawares as may, within one month after the signing of this agreement, desire to be added thereto, and the selections of the lands to be purchased by the Delawares may be made by said Delawares in any part, of the Cherokee Reservation east of said line of 96° not already selected and in possession of other parties, and in case the Cherokee lands shall hereafter be allotted among the members of said nation, it is agreed that the aggregate amount of land herein provided for the Delawares, to include their improvements according to the legal subdivisions when surveys are made (that is to say, one hundred and sixtjr acres for each individual), shall be guaranteed to each Delaware incorporated by these articles into the Cherokee Nation, nor shall the continued ownership and occupancy of said land any Delaware so registered be interfered with in any manner whatever without his consent, but shall be subject to the same conditions and restrictions as are by the laws of the Cherokee Nation imposed upon native citizens thereof.
“Provided, that nothing herein shall confer the right to alienate, convejq or dispose of any such lands except in accordance with the constitution and laws of said Cherokee Nation. . * * *
“And the said Delawares further agree that there shall be paid from their funds now or hereafter to come into the possession of the United States a sum of money which shall sustain the same proportion to the existing Cherokee national fund that the number of Delawares registered as above mentioned and removing to the Indian country sustains to the whole number of Cherokees residing in the Cherokee Nation. * * *
“And that there may be no doubt hereafter as to the amount to be contributed to the Cherokee national fund by the Delawares, it is hereby agreed by the parties hereto that the whole amount of the invested funds of the Cherokees, after deducting all just claims thereon, is $678,000.
“And the Delawares further agree that in calculating the total amount of said national fund there shall be added to the said sum of $678,000 the sum of $1,000,000, being the estimated value of the Cherokee neutral lands in Kansas, thus making the whole Cherokee national fund $1,678,000; and this last-mentioned sum shall be taken as the basis for calculating *239 the amount which the Delawares are to pay into the common fund. * * *
“All cash, and all proceeds of stocks, whenever the same may full due or be sold, received by the Cherokees from the Delawares under the agreement, shall be invested and applied in accordance with the 23d article of the treaty with the Cher-oke \s of August 11, 1866.
‘ • On the fulfillment by the Delawares of the foregoing stipulations, all the members of the tribe registered as above provided shall become members of the Cherokee Nation, with the same rights and immunities, and the same participation (and no- other) in the national funds, as native Cherokees, save as hereinbefore provided.
“And the children hereafter born of such Delawares so incorporated into the Cherokee Nation shall, in all respects, be regarded as native Cherokees.”
Signed. * * *
At the outset of the discussion of the legal and equitable rights of the parties in this proceeding, and the proper determination of the issue presented by the record, we must look to the statute by which the court is given jurisdiction, as by that law the power of the court is measured and determined. Beyond it we have no power of adjudication. There is no controversy or question as to the form of the proceeding and rightful character of the petitioners. Some objection was made as to the want of proper parties as complainants, hut that contention was abandoned in the trial of the case.
The statute gives the power to either party to bring suit in this court for the purpose of determining the estate or interest of the Delaware Indians in and to the land and funds of the nation under their contract and agreement with the Cherokee Nation dated April 8, 1867. The purpose of the statute is to settle by judicial adjudication the rights of the respective parties in and to the lands and funds of the Cherplcee Nation.
In order to settle those rights, we must determine by construction of the agreement the extent of interest — the estate which the Delawares acquired in the land granted to them by the Cherokee Nation, and their rights in the funds of the nation as affected by the action of the political department of the government of the Cherokees.
The jurisdiction of the court as to the subject matter of *240 investigation is defined by the statute, in the words following, to wit:
“For the purpose of determining the rights of said Dela-ivare Indians in and to the lands and funds of said nation under their contract and agreement with the Cherokee Nation dated April 18, 1867.”
Under that provision of the Jaw two questions arise: First, What are the rights and equities of the Delaware Indians in and to the land sold or agreed to be sold by the terms of the agreement made as aforesaid; and second, What are the rights and equities of the Delaware Indians in and to the funds of the Cherokee Nation as affected by the alleged misconduct of the respondent?
We will consider the questions in the order stated, reciting so much of the bill as is necessary to the development of the issue.
The fifth paragraph of the petition alleges, in substance, tliat at the date of making and approval of the agreement there were 985 individuals of the Delaware tribe who had been enrolled upon the register referred to in the agreement, being the list of Delawares who elect to remove to the “Indian country;” that the complainants stated herein were among the 985, enrolled as aforesaid; that 212, of the said 985, are now living and residing in the Cherokee Nation; that 773, of the 985, have died since the making and approval of said agreement, leaving descendant heirs at law and personal representatives; that the individual complainants herein are among the children and heirs at law.
That allegation of the petition is substantial^ admitted— not noticed by the respondents.
The sixth paragraph of the petition avers that the Indians bought 157,600 acres under and by virtue of said agreement, and paid therefor the sum of $157,600, being at the rate of $1 per acre.
This allegation of the petition is denied by the respondents, in this,' to wit: That the Delawares purchased onljr a life estate in 160 acres per capita.
Paragraph 11 avers, in substance, that the Delawares are entitled legally and equitabty to 157,600 acres of land, which *241 they have selected and segregated from the other lands of the Cherokee Nation. This allegation is denied, except as to the right of each individual Delaware registered as aforesaid, now living may be entitled to 160 acres of land under the terms of the contract between the Delawares and Cherokee Nation, and to receive in ary further allotment not less than 160 acres of said lands. It is denied that said amount of land has been segregated as alleged, and denies the right or authority of the Delawares or anj' other persons to segregate or set apart that portion of land. As to the division of said land, it is alleged on the part of the defendants that no allotment can be made except to assign to each member of 'the Cherokee Nation an equal portion thereof, reserving to the registered Delawares living at the time at least 160 acres.
It is substantially averred in the twelfth paragraph of the petition that in violation of the rights of the Delaware Indians the Cherokee Nation has admitted other persons not Cherokees to share in the lands and funds of the Cherokee Nation, and thereby diminish the share which the Delawares are entitled to have and receive in such lands and funds of the Cherokee Nation, and for which they paid their money. To that allegation it is insisted by the 'defendants that whatever has been done has been in accordance with and by virtue of the sovereign powers of said nation^ property and legally exercised under the laws of the nation, and that the Delawares have no right to complain. It is insisted by the defendants that the court has no right to determine how many persons have been so admitted to the Cherokee Nation.
The thirteenth paragraph charges that persons have been admitted to share who were not entitled to share in the funds and lands of the nation. As to allegations of said paragraph as to the improper use of funds of said Cherokee Nation, they are denied on the part of the respondents.
The issue as to the title and right to the 157,000 acres is contained in the allegations of the eleventh paragraph of the petition, which is in substance that the Delawares are legally and equitably entitled to the said land, which they have selected and segregated, and that they are also entitled to share *242 with the Cherokees pro rata in the division about to be made under the provisions of the act of Congress giving this court jurisdiction to determine the right of the Delawares in the lands and funds of the Cherokee Nation. In other words, it is insisted that the claimants are to have in the division, first, the 157,000 acres allotted to them, and that after such allotment they are entitled to share in the division of the rest of the land and funds upon an equality of right with the citizens of the Cherokee Nation.
The decision of that contention depends upon the construction of the agreement made on the 8th day of April, 1867, in ascertaining- the extent of the estate or right which by the terms of that agreement was conveyed to the claimants. If an absolute fee-simple title was conveyed, or intended to be conveyed, having because of such title the descendible qualities of an estate absolute, then the Delawares own that amount of land in the distribution or allotment of the lands constituting a part of the national lands of the Cherokee Nation.
In the decision of the question as to what the rights of the petitioners are in the lands and funds of the Cherokee Nation we must determine what' the legal effect of the agreement is on which they base their right; and if from the words of the instrument there is an indication of the character of the estate intended to be conveyed, there is no necessity to look beyond the words of the contract in ascertaining the rights of the parties. The obligation of each must be determined within the authority of the statute giving the court jurisdiction, because upon the authority of that statute the court is invested with whatever jurisdiction and power it exercises in its decision of tlie cause.
In the consideration of the matter we must not lose sight of the fact that the agreement which constitutes the basis of this proceeding was made between two tribes or nations of Indians of equal power and capacity to contract, neither having as against the other superior facilities as contracting parties, but being on an absolute equality in. dealing with and protecting their respective rights. They are both presumed to have known the full measure of their interests and to have been of equal abilit}^ in dealing with the subject-matter about which they contracted.
*243 The agreement in substance provides that the parties of the first part, being the Cherokee Nation, in consideration of certain payments and the fulfillment of certain conditions, agreed to sell to the Delaware Indians for their occupancy a quantity of land in the aggregate equal to 160 acres for each individual of the Delaware tribe, who was then enrolled upon a certain register made in 1867, being a list of the Delawares who had elected to remove to the “ Indian country,” to which list there might be added by the consent of the Delaware council the names of such other Delawares as might desire to be added thereto; that the selection of the lands might be made by said Delawares in any part of the Cherokee Reservation east of a certain line, not already selected and in the possession of other parties, and in case the Cherokee lands should be thereafter allotted among the members of said nation it is agreed that the aggregate amount of land provided by the Delawares should include their improvements according to legal subdivisions; that is to say, 160 acres for each individual shall be guaranteed to each Delaware incorporated by these articles into the Cherokee Nation, nor shall the continued ownership and occupancy of said land by any Delaware so registered be interfered with in any manner without his consent, but the same shall be subject to conditions and restrictions as are by the laws of the nation imposed on citizens thereof.
And it is provided that nothing therein shall confer the right to alienate, convey, or dispose of such lands except in accordance with the constitution and laws of said Cherokee Nation.
In the conclusion of the agreement, it is provided that bn the fulfillment by the Delawares of the foregoing stipulation the members of the tribe, registered as above provided shall become members of the Cherokee Nation, with the same rights and immunities and the same participation (and no other) in the national funds as native Cherokees save as herein pro-A'ided, and the children hereafter born of such Delawares so incorporated into the Cherokee Nation shall in all respects be regarded as native Cherokees:
Confining ourselves to the terms of the agreement, we find that the estate is qualified by the word “occupancy,” and *244 nowhere in the instrument do we find the words of “inheritance ” -or “ perpetuity ” attached to the grant. "W hatever may be said of the immediate parties to the instrument, as to their technical acquirements- in the law in the designation and conveyance of estates or interests in the land,-it must be assumed from the phraseology of the contract that it was drawn by some one having that technical knowledge of the law of conveyance which would enable the parties to express in apt words of designation a- fee-simple or absolute title if such was intended by the agreement. The terms “ agree to sell” simpty operate in the sale on such an estate as the parties intended to convey, as exemplified bj^ the words used in the convejmnec. The sale was to the Delawares for their “ occupancy,” thereby impressing a limitation on the estate contemplated bjr the parties.
It is insisted by the complainant that the grant expressed by^ the terms of the agreement conveys to the Delawares an absolute estate, a right without end or limitation in the estate granted, an estate of inheritance descendible to the heirs or successor of the original grantees.
The court must in the construction of the words of the grant apply the rules of construction which from the earliest times down to the present have been adopted by courts in the measurement of estates from the covenants of the conveyances. If the grant is made to a person for his occupancjq can it be successfully maintained that by the most liberal construction of the grant it extends beyond the period of his actual life? In the execution of the contract as to the land intended to* be granted the Cherokee Nation was dealing with registered Indians and with those who might be registered in pursuance of the terms of the agreement. As to those born thereafter express provision is made; they were in all respects regarded as native Cherokees. Can it be said that, being entitled only to the rights of native Cherokees, they have any interest in the lands granted to the Delawares beyond that which might result to them from the accretion of the 157,000 acres of land of the nation incident to the exhausted estate of the registered Delawares?
Does the sale and conveyance of the lands to the registered Indians inure to the benefit of those born thereafter and *245 who would, b}*- the principles of the common law, succeed as heirs to the estate, having the qualities of an estate of inheritance?' After the occupation of the registered Indians has ceased by their death or abandonment, is not the land relieved of the estate provided by the grant to the registered Indians, and must it not form a part of the common land of the nation as against unregistered Indians, they being placed on an equality with the native Cherokees ?
The agreement must be considered in all its parts, and from it, as a whole, must be deduced the true interpretation of its provisions. Two classes of Indians were provided for the by terms of the agreement: First, registered, who constituted the basis of the grant of the 157,000 acres of land, and second, children of the registered Indians born after the date of the agreement.
As to the first, in the closing paragraphs of the contract it is in substance provided that upon the fulfillment of the stipulations they were to become members of the Cherokee Nation, with the same rights and immunities and the same participation in the national funds (and no other) as native Cherokees, save as hereinbefore provided, and the children hereafter born shall in all respects be regarded as native Cherokees.
As to the registered Indians, they were to be incorporated into the body politic on an equality with the native Cherokees in the national fund, superadded thereto the rights here-inbefore provided, but no reservation of that kind was made in behalf of the children of such registered Indians. They being a class distinct from the registered Indians, were placed by the very terms of the agreement on a perfect equality with the native Cherokees. They are to be like unto them in all respects. There is a class of Indians, perhaps very insignificant in numbers, who are not provided for, and that is the Indian who was in being on the 8th of April, 1867, and who was not on the register roll, and who did not within one month thereafter remove to the Indian country.
As to such Indians no provision is made, so that the classification becomes the registered Indians and children born after said date to said registered Indians.
It is not claimed by counsel for the petitioners that the *246 agreement conveyed a technical title in fee simple, but that the Cherokees conveyed whatever title they had in the lands by the agreement of 1867, which operates in law as an estate equivalent to fee simple. It is said, “It is not important as between the complainants and the respondents whether this title was a fee simple or an Indian title of occupancy or some other title,” but it is interesting to note that in Holden v. Joy (17 Wall., 211) the court uses the following significant language. We quote from the syllabus:
“The Indian tribes are capable of taking as owners in fee simple lands by purchase whore the United States in form, and for a valuable and adequate consideration, so sell them to them. ”
In order to maintain the theory of the respondents our attention is called to the case of the Cherokee Nation v. Journeycake (155 U. S., 213, 214, and 215), affirming the decision of this court (28 C. Cls. R., 281), in which it is alleged b}T counsel for the respondents that the Supreme Court decided that the. Delawares did not take in fee under the contract of 1867.
It is contended on the part of the complainants, that whatever was said by the court in that case upon the question of the title of the Indians in and to the lands was not required bjr the issue in that case, and therefore the decision is not binding on this court in the present proceeding; that the matter is not res judicata, but open to the investigation and decision of this court. Conceding that the tenure by which the Delaware Indians held their lands under agreement was not properly within the purview of the issue in the case of Journey calce {supra) the court majr still regard that decision in the light of an authority entitled to great weight as persuasive in the proper construction of the terms of the agreement.
In the Journeycalte case (supra) it is said:
“The individual Delawares took their homes in and remaining in the Cherokee Reservation and as lands to be considered in any subsequent allotment in severalty among the members of the Cherokee Nation.” * * *
“Neither should too much weight be given to the fact that the Delawares were to pay for their homes at the rate of $1 per acre, for byr that purchase thejr acquired no title in fee simple. ”
*247 “This Indian Territory was looked upon as the permanent home of the Indians. The Government was making- the effort to bring within its limits all the Indians from all parts of the land, and it was not in the contemplation of the Government or of these contracting parties that at any early day these lands would be thrown open to settlement and sale, but rather the idea was that they were to be continued as their permanent place of abode. Considered as such, so long as each individual Indian, whether Delaware or Cherokee, had his particular tract for occupancy as a home it was not unnatural or unequal that the vast body of the lands not thus specifically and personally appropriated should be treated as the common property of the nation, in respect to which all who were members thereof, whether bjr birth or adoption, should be entitled to equal rights and privileges.”
In the agreement of the 8th of April, 1867 {supra), reference is made to the fifteenth article of the treaty between the United States and the Cherokee Nation, made on the 11th of August, 1866, and the treatjr of August 10,1866, between the United States and the Delaware Indians, providing for the removal of the Delaware tribe to the Indian country south of Kansas, and a further pi-oviso and agreement made by the United States to sell said tribe a tract of land being a part of a tract the cession of which was then contemplated by the Cherokees, and that in view of such treaties the agreement was made which is the subject of contention in this proceeding.
It is insisted that by the terms of the foregoing treaties the Delaware Indians were, bj^ the conveyance, to receive in consideration of their payments an absolute title in the land, and that the same rights were to be given the Delawares in the agreement of 1-867, such agreement having been made in lieu of the conveyance under the treaty of August, 1866.
The recitals in the agreement clearly show that it was the result of the failure to locate the Indians under those treaties which made the agreement of 1867 necessary, hut it does not necessarily follow that the agreement is identical in legal effect.
The treaty of 1866 provided in substance that in case any tribe settling in the country should decide to preserve their tribal organization and maintain their laws and customs, they should have a district of country set off by metes and bounds equal to the 160 acres of land for each man, woman, and child *248 of said tribe. But no such provision is found in the agreement or treaty of 1867. The terms of that agreement provide that the registered Indians shall become members of the Cherokee Nation “with the same rights and immunities and the same participation (and no other) in the national funds as native Cherokees, save as hereinbefore provided.”
It is said by the Supreme Court in the case of Jouneycake (155 U. S., 205):
“There is no provision for setting apart a distinct body of land in any portion of the reservation for the Delaware tribe, but the agreement is to sell them for their occupancy a quantity of land equal in the aggregate to 160 acres for each individual Delaware ‘who may remove to the Indian country,’and the selection of the amount to be purchased by them may be made by said Delawares in anjT part of the Cherokee Nation east of said line of 96° not already selected and in the possession of other parties. ”
It is stated by counsel for the complainant, that the Cherokee Nation in defending the action of the Delawares in the litigation in the Journeycake case (supra) insisted that the Delawares had bought a definite number of acres; and that they were not entitled to participate in the distribution of the funds arising out of other lands.
It is sufficient answer to that position to say that such contention was not sustained by the Supreme Court, and does not, therefore, work an estoppel on the contention of the respondent in this proceeding.
The recitals in the agreement of 1867 do not justify the conclusion or inference that under that agreement the parties intended to convey and receive by such conveyance the full extent of the rights which might have accrued to the grantees by virtue of the provision of the treaties of 1866.
It is expressly stated in the recitals of the agreement that no such cession of land was made to the United States, but “in lieu thereof tei’mswere provided, as hereinbefore named, under which friendly Indians might be settled on their lands.” It was because there had been a failure of the policy and plan contemplated and provided by the treaty of August 11, 1866, that a new agreement had to be made, and the result of that failure is the contract of 1867. The sixteenth section of the *249 treaty, August, 1866, provides that Indians mig’ht settle west of the ninety-sixth degree, the land to be taken in compact form in quantities not exceeding 160 acres for each member of the tribe, the boundaries of the district to be distinctly marked and the land “to be conveyed in fee simple ” to each of said tribes, to be held in common in severalty as the United States might determine.
It will be seen that the fifteenth and sixteenth sections of the treaty of August 11, 1866, make a distinction founded upon the settlement of the Indians either east or west of the ninety-sixth degree; east of the line it is grant of settlement and possession, but west of that line the grant is to be in fee simple. Recurring to that treaty as indicative of what the parties intended by the contract of 1867, it is worthy to note that the term “ fee simple” is used as to one grant and omitted as to the other. The Cherokee Nation, in the policy of their national development, granted a fee simple in one part of their countiy as to the rights of Indian tribes which desired a change of their habitat, but to another depending on the location of the grant a different tenure of right or estate.
We have discussed the rights of the respective parties from the standpoint of what is apparent on the face of the contract, but it is one of the contentions of the complainants that the proof in the case establishes the fact that the Delaware Indians understood and believed at the time of the execution of the agreement that they were getting, a right in the land coextensive with an absolute ownership, and that the land was to belong to the-Delaware blood in perpetuity. Much testimony has been taken on that subject, the large preponderance of the witnesses being Delawares, with a few Cherokees. Without a lengthy discussion of the question as to whether it is competent to attempt to establish the interpretation of the agreement by such testimony, it is sufficient to say that it would be a most dangerous precedent after such a lapse of time to permit a few parties, mostly on one side of the con-troversjr, to give construction to the agreement by their recollection of what they understood to be the extent of their rights at the time the agreement was executed. As has been said, this is a litigation not between the United States and “an unlettered people,” but between litigants of the *250 same generic people, each having the same ability of comprehension and sagacity in the assertion and maintenance of their respective interests and rights. Whatever of ambiguity there maj'' be incident to the contract of the parties it arises on the face of the instrument and belongs to that class denominated in the law as a patent, and therefore must be dealt with from the terms and words in which the parties have sought to exemplify, their agreement.
If it were a latent ambiguity arising from collateral circum‘stances or matter, the condition would be subject to the introduction of parol evidence; but being patent if at all, the evidence offered of witnesses and papers is incompetent. (69 Ala., 140; 1 Mason, 9; 8 Lea, 499; Greenleaf’s Evidence, secs. 300, 301.) It is true that in constructing a contract, as in considering a statute, the court should look into the circumstances and conditions under which it was made or passed; but that is not in derogation of the rule that parol evidence is inadmissible to vary or even construe a contract, except to relieve the parties from the embarrassment of a latent ambiguity.
. To maintain the contention in this particular on the part of the complainant, our attention is called to the case of United States v. Payne (8 Fed. Rep.); Worcester v. Georgia (6 Pet., 515); Miami County v. Breckenridge (12 Kans.); Kansas Indians (5 Wall., 737); Choctaw Nation v. United States (119 U. S., 1).
We have most carefully considered those cases and others cited, and do not find in them a justification to permit the complainant to introduce the testimony in the record in order to show that some of the beneficiaries understood that the Indians were to get an estate absolute in the lands purchased, thereby giving construction and interpretation to the words of the agreement.
The question of the right of a dissatisfied portion of the Cherokee people represented by the Eastern Band of Cherokees was before the Supreme Court in the case of that band against the United States, reported in 117 U. S., 288, and in that connection the Supreme Court said:
“While the treaty of 1846 was under negotiation one William H. Thomas appeared in Washington as representa- *251 tire of Cherokees in North Carolina and urged a recognition of their demands for the per capita money and the removal and subsistence money under articles 8 and 12 of the treaty of 1835. He had obtained a statement from one of the commissioners who negotiated that treaty on the part of the United States, from several respectable persons who were privy to the negotiations, and from some of the Cherokees who signed the treaty, as to the meaning which should be given to certain terms used in it; and we are referred to these documents as though they should have some influence upon the construction of those terms. But it is too plain for controversy that they can not be used to control the language of the treaty or guide in its construction.”
The law of real property is to be found in the law of the situs. The law of real property in the Cherokee country therefore Is to be found in the constitution and laws of the Cherokee Nation.
In the case of Journeycake v. Cherokee Nation (28 C. Cls. R., 281, 303), the court, by Chief Justice Nott, had reason to examine this law of property, and made the following abstract of it:
“The preamble of their constitution, September 6, 1839, like that of the Constitution of the United States, sets forth the general purpose of the instrument:
“ 1 We, the people of the Cherokee Nation in national convention assembled, in order to establish justice, insure tranquillity, promote the common welfare, and to secure to ourselves and ohr posterity the blessings of freedom, acknowledging with humility and gratitude the goodness of the Sovereign Ruler of the Universe in permitting us so to do, and imploring His aid and guidance in its accomplishment, do ordain and establish this constitution for the government of the Cherokee Nation.’
“The constitution then takes up (and it is most significant that it does so by its first article) the subject of paramount importance in the Indian mind — of more importance than the form of government, than the right of representation, than the right of trial by jury, or of habeas corpus, or of any of those principles of civil liberty which in the Anglo-Saxon mind are held supreme — the subject of their lands.
“‘Sec. 2. The lands of the Cherokee Nation shall remain common property; but the improvements made thereon, and in the possession of the citizens of the nation, are the exclusive and indefeasible property of the citizens, respectively, who made or may rightfully' be in possession of them: Provided, That the citizens of the nation possessing exclusive and indefeasible right to their improvements, as expressed in this *252 article, shall possess no right or power to dispose of their improvements in any manner whatever to the United States, individual States, or to individual citizens thereof, and that whenever any citizen shall remove with his effects out of the limits of this nation, and become a citizen of any other government, all his rights and privileges as a citizen of this nation shall cease: Provided, nevertheless, That the national council shall have power to readmit, by law, to all the rights of citizenship any such person or persons who may at aiyr time desire to return to the nation, on memorializing the national council for such readmission.
“ ‘Moreover, the national council shall have power to adopt such laws and regulations as its wisdom may deem expedient and proper to prevent citizens from monopolizing improvements with a view of speculation.’
“The amendment of 1866 modifies the foregoing as follows:
“‘Sec. 2. The lands of the Cherokee Nation shall remain common property until the national council shall request the survey and allotment of the same, in accordance with the provisions of article 20 of the treaty of 19th of July, 1866, between the United States and the Cherokee Nation.’
“With these restrictive provisions should be considered the brief grant which the constitution contains of legislative power:
“ ‘ Sec. 14. The national council shall have power to make all laws and regulations which they shall deem necessary and proper for the good of the nation which shall not be contrary to this constitution.’
“The legislation of the Cherokees recognizes again and again the communal character of the seizin or occupancy of the land. It is not ‘ lawful for any citizen of the Cherokee Nation to sell any farm or other improvement in said nation to any person other than to a bona fide citizen thereof;’ nor ‘ to rent any farm or other improvement to any other person than a citizen of the Indian Territory.’ (Revised Code, 1814, Art. XXI, sec. 112, p. 234.) ‘No person shall be permitted to settle or erect any improvement within one-fourth of a mile of a house, field, or other improvement of another citizen without his, her, or their consent, under the penalty of forfeiting such improvement and labor for the benefit of the original settler; provided, it .may be lawful, however, where a settler has a field one-half mile or more from his residence, and where there may be a spring or running water and timber, for another citizen to improve and settle one hundred yards from such field so situated.’ (Act 24th September, 1839, id., p. 249.)
“The law regulating intermarriage with white men or foreigners provides that should a citizen of the United States *253 or any foreign countiy ‘ become a citizen of the Cherokee Nation by intermarriage,’ and be left a widower, he shall continue to enjoy the rights of citizenship unless he shall marry a person ‘having no rights of Cherokee citizenship by blood; in that case, all of his rights acquired under the provisions of-this act shall cease.’ (Eevised Code, 1874, Art. XV, sec. 74, p. 223.) If he abandons his wife, he,‘shall thereby forfeit every right and privilege of citizenship ’ and shall ‘ be removed from the nation.’ (Sec. 75.)”
With this system of land law before us, it is unreasonable that this agreement was intended to be in derogation of the system and contrary to the usages of occupants throughout the entire Indian country from the Atlantic to the Pacific. At the time the agreement was entered into the citizens of the Cherokee Nation held no other right or interest in the land than the right of occupancy as communal owners. The common law did not prevail in the Cherokee country, and an estate in fee simple absolute was a thing utterly unknown. After the agreement was executed and went into effect there were Cherokees by blood having a right of occupancy, and Cherokees bj' adoption, the Delawares, having a right of occupancy. The only distinction that can be made between them was that the Cherokees bought their right of occupancj^ from the United States, and the Cherokees by adoption bought their right of occupancy from the Cherokee Nation, and that is a distinction without a difference. The agreement must be construed with reference to the constitution and laws of the Cherokee Nation.
The second subject-matter embraced in the statute of our jurisdiction is the fund belonging to the Cherokee Nation. It is substantially averred in the twelfth paragraph of the petition that in violation of the rights of the Delawares the Cherokee Nation has admitted other persons not Cherokees to share in the lands and funds of the nation, and thereby diminished the share which the claimants are entitled to receive of the funds of the nation. To the allegation of that paragraph the respondents answer that if any persons have been admitted as citizens of the nation it has been done in accordance with and by virtue of the sovereign power of the nation.
The complainants insist that they have a right to participate in the communal property of the Cherokee Nation when the *254 same comes to be divided or distributed in the ratio of one to thirteen and seventy-eight one-hundredths (1 to 13.78).
It is contended that while it is true the Supreme Court has said that the rights of property of the native Cherokees spring from citizenship, it does not necessarily follow that persons who are made citizens for the purpose of giving jurisdiction over them to the Cherokee national government have a right to participate in the common property.
The objection on the part of the complainants to the incorporation of citizens as alleged has reference more particularly to intermarried citizens of the nation. It is contended that while they may be citizens in a political sense they have no rights except those purely political.
To support the theory on the part of the complainants the attention of the court is called to article 5 of the Cherokee treaty of 1835 (7 Stat. L., 478), under which it is alleged the Cherokee Nation has exercised its rights of self-government previous to the act of J une 28, 1898.
We see by this article that—
“The United States hereby covenant and agree that the lands ceded to the Cherokee Nation in the foregoing article shall, at no future time, without their consent be concluded (included) within the territorial limits or jurisdiction of any State or Territory, but they shall secure to the Cherokee Nation a right by their national council to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them: Provided, That none of the laws of the Cherokee council shall be inconsistent with the Constitution and laws of the United States.”
The latter part of the above quotation seems to recognize two classes of inhabitants, to wit, the people of the Cherokee Nation, and such persons as have connected themselves with them, thus recognizing a condition of the native people of the nation and other persons, making no distinction between the two classes of persons. .
In the case of the Cherokee Nation v. Journeycake (supra) it is said in relation to the rights of the Delawares to participate in the funds arising from the sale of a portion of the land of the nation, “that the thirteen millions of acres, whether *255 properly styled its ‘ common property ’ or its ‘public domain,’ belonged to the Cherokee Nation as a nation is beyond dispute.” The constitution of the Cherokee Nation, under which the persons against whom the petitioners complain were introduced into the body politic, was adopted by the nation in 1866, and from that 'time' until the present it has been in force as the constitution of the nation. It was in force at the time the contract was made by the Delawares. _No effort has been made to invalidate it, and by the voluntary act of the Delawares they became a part of the nation at the time the provision of the constitution was^ in force under which from time to time the admission of persons has been allowed, and without a formal decision of its legality, it is the opinion of the court that the complainants are estopped from questioning the binding force of the constitution.
The Supreme Court in the case of the Eastern Cherokee Indians v. Cherokee Nation (117 U. S., 288) decided in substance:
“ By treaties with the Cherokees the United States have recognized them as a distinct political community, so far as inhabitants, as to specify and require negotiations with them in that character.”
Being clothed with the characteristics of a distinct political community, the nation must have incident to it the right and power to admit to citizenship such persons as it may desire, and, being admitted to citizenship, they partake of all the rights of a citizen in a political sense and an equality in common with the other citizens in property and funds of the body politic. The communal property of the nation becomes theirs in the same sense that it is common to other citizens.
It is charged in substance in the fourteenth and fifteenth paragraphs of the bill that the Cherokee Nation has improperly and without right used its communal funds and expended the same wastefully and lavishly, and thereby prevented the Delawares from receiving a just and proper share in the Cherokee funds. This in substance is a charge of maladministration on the part of the political power of the nation in the discharge of its function, the consequences of which is common to the Cherokee people and the Delawares; but it is insisted that the whole of the amount thus improperly and *256 fraudulently administered shall be charged against the Cherokee people and that the share of the Delawares shall be exempt from any diminution in consequence of such fraudulent use of the fund. The allegation of the petition as to the improvident and unlawful use of the fund is denied by the respondent, and that the court is without power under the statute to make an investigation of the alleged fraudulent and improper use of the fund. The question presented by the averment of the petition in respect to the manner in which the nation has discharged the functions of its legislative authority, or the executive authority of the nation, involves the entire administration of the political and executive departments of the government from the time of the admission of the Delawares under the contract of 1867 to the bringing of this suit, during all of which time the complainants were a part of the body politic represented byr such nation, and it is not shown that the Delawares in any responsible form opposed in any way the policy or the measures adopted by the nation in its administration of the funds of the nation.
IN the introduction and admission of the Delawares as a part of the Cherokee Nation they became a part of the people of such nation and bound in common with the Cherokees by the political power of the nation in reference to the communal funds of the nation. It would be extraordinary indeed if Congress intended that this court should, under the powers of the statute, examine into the acts of the nation so as to correct the mistaken policy of the nation or its alleged lavish expenditure of its funds.
In this connection it is proper to note the intervening petitions of the “ Keetowah Society of the Cherokee Nation, being an organization of full-blooded Cherokees.”
In the original petition to which the intervening petition is an adjunct the claim is made by, as they'' allege themselves, “full-blooded Cherokees.”
The ground on which the Delawares base their claim is that as to them, because they are Delawares, there is a jurisdiction in this court to adjudge and decree redress against the alleged unlawful acts of the Cherokee Nation. From what is said as to the rights of the Delawares, it must follow that as to the claim of the intervenors there can be no possible jurisdiction in this court.
*257 The statute recognizes two distinct parties which are clothed as against each other with the qualities of a litigant, to wit, the Delawares and Clierokees, and either party may become the complainant, but there is no right given to any part of the Cherokee Nation to become as against the nation a complainant, and therefóre, as to the complainants in the intervening-petition, there is no jurisdiction in the court, and that petition is therefore dismissed. If they have any just cause to complain, they must seek some other jurisdiction clothed with the power to adjudicate their rights founded on their grievances.
This being a proceeding in equity, no findings of fact are required, and therefore none are made. The order of the court is that the petition of the complainants be dismissed.